Nanette Dembitz, J.
This is a proceeding to free a child permanently from her mother’s custodial right, in order to permit the child’s placement for adoption by the petitioning child care *70 agency, the Leake & Watts Children’s Home, Inc. Under article 6 of the Family Court Act of New York the court is authorized to permanently terminate parental rights, if it finds that a child who has been placed outside his home under the supervision of a child care agency is ‘ ‘ permanently neglected ”. “ Permanent neglect ’ ’ is established when ‘ ‘ the parent * * * has failed for a period of more than one year following the placement * * * substantially and continuously or repeatedly to maintain contact with and plan for the future of the child, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship. ’ ’ (Family Ct. Act., § 611.) The court concludes that all these conditions have been met with respect to Myra Jones and that she is a “ permanently neglected ’ ’ child within the meaning of the Family Court Act.
The determination of this case depends mainly on questions of statutory construction of first impression: (1) Whether the statutory one-year period refers to any year during the placement, or only to the year immediately prior to the filing of the petition for termination of parental rights; and (2) the meaning of “ substantially * * * plan for the future of the child These issues of construction will be considered in the context of the facts.
Myra was born out of wedlock to respondent mother, Miss Jones, when she was 16. Respondent at her own mother’s insistence asked the New York City Bureau of Child Welfare to find a home for Myra when she was three months old. Ever since then Myra, who is now four and one-half years, has lived with the foster parents with whom petitioner child care agency placed her.
Respondent’s counsel contends that respondent ‘ ‘ planned ’ ’ for Myra’s future, and satisfied this condition for maintaining her parental right, in that she allegedly attempted during the past year to find a larger apartment and to apply for an increase in the public assistance she was receiving, in order to undertake Myra’s care.[1] Respondent also contends that during this period, being the fourth year of Myra’s placement, petitioner failed to make “ diligent efforts ”, as required by statute, to encourage the parental relationship. Petitioner’s witness testified that from January to June; 1968 it received no response to numerous letters attempting to arrange visits with respondent; it discon *71 tinned its efforts in the latter month after determining to commence the instant proceeding. In view of this court’s construction of the statute it need not resolve the issue of whether petitioner, to comply with the statute, should have made greater efforts to contact respondent during the past year.

1. Construction of One-Year Provision

The statute appears carefully worded to permit a finding of permanent neglect if the conditions of agency efforts and parental failures have occurred for a continuous period of mófe than one year at any time during the child’s placement. This construction is consistent with the common-law treatment of abandonment, which the permanent neglect statute was to supplement f the parent has no right to block an adoption if he abandoned his child, despite his change of heart in the interim since then.[2]
[3] Furthermore, a justification for relying on a year other than the one immediately prior to the permanent neglect petition is that, as in the instant case, the agency staff may have decided to end its efforts to strengthen the parental relationship some months before it became feasible, due to intra-agency review of the matter, to commence the proceeding. Finally, neglectful conduct for a period of more than a year will be strongly evidentiary in the prognosis for stable, responsible, and affectionate care by the parent even if an interval has elapsed since then.
This construction of the permanent neglect statute will not, however, lead to injustice in the event that a parent’s sense of responsibility towards the child has developed in the interim before the proceeding, because the court would be obliged to consider this development in its final disposition of the petition. For it is a clear and salutary aspect of the statutory pattern that the court must, after an affirmative finding as to more than a year of agency efforts and parental failures, then consider the final condition for a termination of parental custody: whether the child’s interests as of the time of the court’s order require it (Family Ct. Act, 614, subd. [e]; §§ 623, 631-634).
Thus the question before the court is whether the components of ‘[1] permanent neglect ’ ’ have been established for a continuous period of more than a year at any time since Myra’s placement.

*72
2. Petitioner’s Efforts to Strengthen Parental Relationship

It is true, as respondent contends, that agency representatives suggested to Miss Jones at the .beginning of the placement and once or twice thereafter that she surrender Myra for adoption. However, the agency’s record, properly admitted into evidence under CPLR 4518 as a record kept in the regular course of business, makes it crystal clear that the agency accepted respondent’s rejection of this suggestion, and wholeheartedly attempted for at least three years to help effectuate a plan for her to establish a home for Myra.
For approximately the first year and a half after Myra’s placement (from December 15, 1964 to July or August, 1966), Miss Jones repeatedly stated the intention of finding work to support herself and her child; during the latter half of the second year of placement, respondent proposed that her mother take care of Myra or that she (respondent) marry and establish a home for her with her husband; during the third year of placement, when she was residing with her second out-of-wedlock baby on public assistance, her alleged intention was to apply for public assistance for Myra as well. The agency workers supported these successive plans over these three years, repeatedly seeking out respondent to discuss them, encouraging her to secure work and' work-training, exploring care for Myra by Miss Jones’ mother,[4] and contacting her public assistance worker on her behalf.
Besides trying to aid Miss Jones to assume the child’s care, the agency also made efforts to strengthen the parental relationship by initiating and facilitating respondent’s visits with her. During the first two years of placement these visits, which respondent undertook only sporadically, were in the main conducted at places she elected. During the third year, the agency attempted to alleviate the disturbing effect on Myra of this visiting pattern by restricting visits to the agency grounds, though at all times encouraging respondent’s contact with her. While respondent accepted this arrangement only one out of the three times it was offered, indicating displeasure with it on the other two occasions, the agency’s limitation on the locus of visits does not establish a failure in its efforts to strengthen the parental relationship. It would be faithless to its duties as an authorized child-care agency (see Family Ct. Act, § 119; Social Services *73 Law, § 371), if in these efforts it ignored the child’s welfare; and the permanent neglect statute cannot be construed to envisage such an abandonment of its proper concerns.[5]
In sum, the court finds that throughout the first three years of Myra’s placement, petitioner agency “ made diligent efforts to encourage and strengthen the parental relationship ” with respondent.
3. Construction of Requirement of “ Substantial Plarmmg ” for Child
Construing the statutory phrase to “ substantially * * * plan for the future of the child ’ ’ in the light of the statutory purpose, the court holds that it requires the parent to plan constructively in a manner that he can and does attempt to implement. To “ plan ”, according to Webster’s Dictionary, means to “project, program, schedule”; the connotation is activist. Since the statutory mandate is that the parent plan for the child’s “ future ”, it does not require the consummation of the parent’s plan to care for the child within the year of planning. However, the “ substantiality ” of the plan for the particular parent must be evidenced by his performing some act to advance its accomplishment. Unless ‘ ‘ substantially plan ” is so interpreted, the provision that the parent must be “ physically and financially able ” to plan (in order for his failure to do so to be significant), would be pointless, for physical or financial capability is irrelevant to a phantasy-plan.
Here respondent over the first three years of placement gave lip service to planning, but nothing else. In response to the agency workers’ efforts, she articulated a shifting series of intentions, none of which were substantial enough from her standpoint for her to make any attempt to carry them out. Their insubstantiality was not surprising since even her words were cued by agency visits rather than self-motivated. Miss Jones’ remark that she might want to take Myra home when she and her half-sibling (then age 2) would both be attending school, articulated her willingness to leave Myra in indefinite foster care. She *74 in fact was content to ‘ ‘ let others raise and be responsible for and love ” her child.[6]
To free a child from a parent with such a low level of interest and responsibility as respondent displayed is precisely the purpose of the statute. It was enacted so that a child’s opportunity for ‘ ‘ normal, lasting family relationships * * * [and] normal family affection and care ’ ’ from adoptive parents could not be thwarted by merely ‘ ‘ minimal contacts ’ ’ with his biological parent.[7]
Accordingly, construing the provision as to planning in the light of its context and statutory purpose, the court finds that respondent failed for a period of at least three years following her child’s placement to substantially plan for her future.
4. Conclusion and Disposition
Permanent neglect having been found, the court must consider What order of disposition is dictated by the child’s moral and temporal interests (Family Ct. Act, § 614, subd. [e]). A report by petitioner, submitted at the court’s request after its finding as to permanent neglect, describes a desirable adoptive home that is available for Myra if petitioner is awarded her custody.[8] With respect to respondent’s retaining custody, even at the hearing in this proceeding and under the threat of permanent severance of all bonds with her child, respondent evinced no settled and definite purpose to assume her care. Nor does anything in responent’s history or the history of her relationship with Myra indicate a probability of her according stable, affectionate, and wholesome care to the child. Accordingly, it is entirely clear that the moral and temporal interests of the child require the permanent termination of respondent’s custody and the permanent award of her custody to the petitioner. When the biological parents fail to accept the parental role, the State in these proceedings must attempt to insure for the child what should be Ms birthright: a responsible and affectionate parental relationship — “a happy home and the love and affection to which all children are entitled.” (See Matter of Knapp, 3 Mise 2d 840, 843 [Surrogate’s Ct., Kings County, 1956.].)
Custody of ciMld awarded to petitioner.

. Respondent and a two-year-old out-of-wedlock child who resides with her, are supported by public assistance; at the time of the hearing the birth of another out-of-wedlock child, who would be added to her public assistance budget, was imminent.

. See Governor’s Message, approving chapters 448 to 450 of the Laws of 1959 (from which article 6 of Family ¡Court Act is derived). (N. T. State Legis. Annual, 1959, p. 415.)

. See People ex rel. Pickle v. Pickle (215 App. Div. 38, 44 [4th Dept., 1925]; ef. Matter of Antonopulos, 171 App. Div. 659 [2d Dept., 1916]; People ex rel. Lentino V. Feser, 195 App. Div. 90 [1st Dept., 1921]).

. Petitioner’s worker diligently investigated this possibility despite the estrangement between Miss Jones and her mother. Miss Jones was herself an out-of-wedlock child, “ boarded out ” from the age of 3 to adolescence, who felt herself rejected by her mother throughout her life.

. It may be noted that the statutes of other States respecting permanent termination of parental rights omit any provision like New York’s relative to agency efforts; they appear to assume that a fit parent will of his own accord exert himself to maintain a parental relationship. In other respects as well, the statutes of other States establish much broader authority than New York’s to provide for the child’s welfare. See, e.g., California Civ. Code, § 232; Connecticut Gen. Stats. Ann., § 17-43a; Georgia Code Ann., § 24-2427; Minnesota Stats. Ann., § 260.221; Wisconsin Stats. Ann., § 48.40.

. See Matter of Toy (19 Mise 2d 89, 91 [Surrogate’s Ct., Wayne County, 1959]).

. Governor’s Message, pp. 415-416 cited supra, n. 2.

. While subdivision (b) of section 625 of the Family Court Act permits the court to treat reports from authorized agencies as entirely confidential, the court will disclose this report to respondent’s attorney if he so requests, since it does not include details from which the precise identity of the adoptive parents could be ascertained.