Nanette Dembitz, J.
This is a proceeding to free a child permanently from his mother’s custodial right, in order to permit the child’s placement for adoption by the petitioning child care agency, the Jewish Child Care Association, Inc. Under article 6 of the Family Court Act of New York the court is authorized to permanently terminate parental rights, if it finds that a child who had been placed outside his home under the supervision of a child care agency is “ permanently neglected.” “Permanent neglect” is established when “the parent * ° * has failed for a period of more than one year following the placement * * ” substantially and continuously or repeatedly to maintain contact with and plan for the future of the child, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship.” (Family Ct. Act, § 611.)
The court’s conclusion is that all these statutory conditions have been met with respect to Stephen B. and that he is a “permanently neglected” child within the meaning of the Family Court Act. The court further concludes, by way of remedy and disposition, that Stephen’s moral and temporal interests require the transfer of his custody from his mother (see Family Ct. Act, § 614, subd. [e]), and hereby transfers his custody to petitioner for the purpose of his adoption by the foster parents with whom he has resided continuously for over four years.
The salient issue in this case is the proper construction of the Family Court Act in the light of the respondent mother’s recurrent hospitalizations for mental illness during the period of her son’s placement in a foster home. Her attorney contended that termination of her parental rights would in effect consti *664 tute a punishment of the mentally ill — unjustifiable because an individual cannot constitutionally be punished for an illness or a condition beyond his control (See Robinson v. California, 370 U. S. 660, 666-667, and p. 685 [White, J., dissenting]).
While it is true that respondent’s mental illness may have affected her conduct towards her child throughout his foster home placement, this proceeding cannot be viewed as a punitive one. Rather, its objective is the welfare of the child; and it is based on the principle that after a mother has shown her maternal unfitness in specified significant respects, the child’s right to the advancement of his moral and temporal interests predominates over her entitlement to him.
INTRODUCTORY FACTS
Stephen was born out of wedlock to respondent Miss B. on January 22, 1963. He was placed in a foster home under the supervision of an adoption agency for his first two months of life; on March 21, 1963, apparently because of Miss B.’s change of mind about surrendering him for adoption, she assumed his care. Ou April 3 or 4, 1963 he was returned to a foster home. Except for that two-week period with his mother, Stephen has been in foster care from the time of his birth. His putative father has never had nor sought any contact with him. On December 3, 1964, Stephen was placed by petitioner agency in the foster home in which he has remained continuously to the present time.
Miss B. was first hospitalized for mental illness in June, 1957, at the age of 18, for a period of eight months, and she was again so hospitalized from January, 1960 to April, 1962. In April, 1963, after caring for Stephen for two weeks, Miss B. was again hospitalized for mental illness. She left the hospital, apparently as a result of a habeas corpus proceeding, in December, 1963; she was again so hospitalized from June, 1965 to October, 1966 and again from February, 1968 to March, 1969. Miss B.’s illness has from its beginning to the present time been diagnosed as ‘ ‘ schizophrenia, mixed type, ’ ’ with a ‘ ‘ guarded ’ ’ prognosis in the sense that recurrent breakdowns and episodes of irrational behavoir may occur.
I.
CONSTRUCTION OF STATUTE AS TO PARENT’S PHYSICAL ABILITY TO MAINTAIN CONTACT WITH CHILD
The first question before the court is during what periods, if any, Miss B. was “ physically able ” to maintain contact with and plan for the future of Stephen within the meaning of the *665 permanent neglect statute; unless she had such physical ability, any failures to contact and plan must, under the New York statute, be disregarded.
1. EFFECT OF HOSPITALIZATION —
In the absence of any previous judicial construction of the term ‘ ‘ physically able ’ ’ in the permanent neglect statute, the court first takes judicial notice of the meaning attributed to it in practice. Judging from the practice of the child care agencies, physical ability to maintain contact with the child means that the parent is physically capable of visits with the child. The agencies construe the parent-child relationship which they are mandated to encourage, to include face-to-face contact rather than contact merely through letters or other detached methods. An interpretation by concerned experts is entitled to great weight,[1] and in this instance seems a reasonable and proper effectuation of the statutory purpose. For, the purpose of permanent neglect proceedings is to determine whether the parent has manifested, despite the child’s placement out of the home, the sense of responsibility, interest, and affection essential to the re-establishment of parental care for the child.[2] Visits with the child — provided the agency facilitates them— would ordinarily to be a minimum manifestation of the required attitude, and in addition would be a necessary psychological preliminary to such re-establishment. Accordingly, the statutory purpose and pattern indicates that a mother’s physical inability to visit the child constitutes a lack of the physical ability to maintain contact to which the statute refers.
The court will assume that Miss B. would not have been permitted to leave the hospital to visit her child during her periods of hospitalization for mental illness, and that the condition of physical ability to maintain contact was not therefore fulfilled during any of the time she was hospitalized.[3]
*666 2. EFFECT OF MENTAL DIFFICULTIES ON MOTHER’S ABILITY TO MAINTAIN CONTACT AND PLAN FOR CHILD
Respondent mother functioned sufficiently between hospitalizations to move from New York City to New Jersey and establish living quarters there independent of her mother, to find and maintain employment, and to enter into heterosexual relationships. However, respondent’s counsel argues that throughout Stephen’s life Miss B. has been suffering from a continuing mental illness, whether or not hospitalized; that such illness should be deemed tantamount to a physical inability to maintain contact and plan for a child; and therefore that respondent’s failures in these respects, even when she was out of the hospital, were excused and nonprobative in relation to “ permanent neglect.”
While the court recognizes that the psychic difficulties which recurrently climaxed in Miss B.’s hospitalization probably had a continuous effect upon her, this possibility does not negate application of the permanent neglect statute. Any mother’s failure to maintain contact with and plan for a child, if she is physically and financially able to do so, must be assumed, in our culture, to stem from a deviation from emotional and psychic normalcy.. Whether the psychic deviation underlying a mother’s neglect of her child also manifests itself from time to time in breakdowns such as Miss B. experienced,[4] or in other forms of flagrant malfunctioning such as resort to alcohol or drugs, or — less dramatically — merely in an apathetic failure to mobilize her psychic and emotional resources, seems to the court irrelevant. To distinguish between the symptoms or types of underlying psychic deviation in mothers who neglect their children in the statutory respects, would neither be feasible nor equitable, nor would it serve the statutory purpose of terminating a child’s relationship with a parent who has failed to manifest the sense of interest, concern and responsibility to which a child is entitled from a parent.
It is clear therefore that the omission of such a term as “ mentally,” “emotionally,” or “psychically” from the proviso as to a mother’s ability to contact her child was deliberate, and that ‘ ‘ physically able ” is to be construed literally to refer to powers of locomotion. Accordingly, during periods when Miss B. was *667 not hospitalized she will be deemed to have been physically able to maintain contact with her child.[5]
3. CONSTRUCTION OF ONE-YEAR REQUIREMENT
As already determined by this court, the period of more than a year of neglect, required to trigger the permanent neglect statute, need not be the interval immediately prior to the petition. (Matter o1f Jones, cited n. 5.) The case at bar points to a reason for that construction of the statute in addition to those stated in Jones; if the mother has been physically or financially unable to contact her child in the interval directly prior to the proceeding, the statutory purpose can be effectuated by the court considering her prior conduct when she was not suffering from such disability.
Here there were several periods of more than a year during Stephen’s placement when Miss B. was physically and financially capable of carrying out her statutory parental role. The court will consider petitioner’s and respondent’s conduct during the most recent of these: October, 1966 to January, 1968.
II. FINDINGS AS TO PETITIONER’S AND RESPONDENT’S CONDUCT.
The record shows that from October, 1966 to January, 1968 petitioner made “ diligent efforts ” to encourage and strengthen the parental relationship, and that Miss B. nonetheless failed to meet the statutory requirements with respect to parental duties.
Following Miss B.’s release from Central Islip State Hospital in October, 1966 and after repeated letters to her from petitioner’s social caseworker (hereinafter sometimes referred to as petitioner), Miss B. came to petitioner’s office several times during the winter of 1966-1967. However, she was resentful and unresponsive when the worker tried to discuss with her her living arrangements and plans for the future. In January, 1967 she moved to New Jersey, where she secured a clerical job; her only plan for Stephen’s care, however, was her hope that her “ boy friend ”, though apparently married and failing to provide for his own children, would make a home with her *668 and Stephen and support them. While she kept an appointment for a visit with Stephen on May 15, 1967 and telephoned to break a subsequent appointment with petitioner, she neither kept her appointment for a June visit nor called to explain her absence. Petitioner tried to contact her at her place of employment, but found she had been discharged. Since Miss B. had refused to give petitioner any other address and since she failed to communicate with petitioner, petitioner was unable to make contact with her from May to November, 1967. Then, finally, in response to a second registered letter petitioner sent her in care of her mother (with whom she occasionally lived) Miss B. came to petitioner’s office with an attorney. The “ boy friend ’ ’ apparently had ended his relationship with her in June, but she said she now had other plans to take Stephen to live with her. However, she would not reveal anything about the alleged plan despite the worker’s statements that she would assist in effectuating it if it was valid. Instead, Miss B’s attorney commenced a habeas corpus proceeding (which was ultimately dismissed for lack of prosecution). In December, 1967 Miss B. stated she was working and living in Lebanon, N. J. and hoped to bring Stephen there. She kept two appointments for visits in December, 1967, and petitioner planned for her to visit Stephen every two weeks thereafter. However, she failed to keep an appointment for a visit on January 8,1968 or contact petitioner in regard to it. When petitioner telephoned her at her place of employment (that again being where respondent wished to be contacted), respondent had been discharged.
On these facts, all established by the petitioner’s detailed and uncontradicted records, duly admitted in evidence under CPLB. 4518, the court finds that respondent mother failed from October, 1966 to January, 1968 to make and keep appointments for visits with her child in a sustained manner, and thus failed substantially as well as continuously and repeatedly, to maintain contact with him, within the meaning of the permanent neglect statute, although physically and financially able to do so. While such a failure is a sufficient basis for a permanent neglect finding, Miss B. also failed during this period substantially to plan for her child’s future. “ Substantially plan ” means to formulate, and act to accomplish, a feasible and realistic plan. (See Matter of Jones, 59 Misc 2d 69, 73.)
The court further finds that during the period from October, 1966 to January, 1968 petitioner made diligent efforts to encourage and strengthen the parental relationship, in that it attempted, despite respondent’s resistance, to help her plan realistically for the future of the child. Further, it continued to *669 attempt to arrange visits for her with her child despite her failure to keep appointments; it tried to smooth and assist her relationship with Stephen when she did see him, and to encourage her confidence that she would be able to achieve a satisfactory relationship with him.
Accordingly, the court finds that all of the circumstances required to establish permanent neglect have been proved by a fair preponderance of the evidence (Family Ct. Act, § 622).
III. TRANSFER OF CHILD’S CUSTODY
Having found permanent neglect and therefore having to determine the dispositional remedy (Family Ct. Act, § 623), the court concludes that the transfer of Stephen’s legal custody to petitioner is in his moral and temporal interests.
First to consider respondent’s application for his custody: The possibility of recurrent breakdowns on the respondent mother’s part is an unfortunate reality, with the attendant emotional impact on Stephen should he be under her care, as well as the need for shifts in his physical custody. That such a breakdown might be triggered by Miss B.’s assumption of responsibility for Stephen — as it apparently was on the one occasion in his life when she undertook his care —• must also be considered. Further, Stephen has shown a high degree of disturbance after respondent’s visits with him, reacting by attacks of trembling, refusal to eat, waking during the night screaming, ‘[1]1 won’t go, ’ ’ and complaining that she’s ‘[1] not my mother — why do you call her that.” The foster parents as well as petitioner, appear to have made good faith efforts to help him accept the respondent; Stephen’s reactions apparently were due to Miss B.’s excessively possessive and emotional gestures towards him, in the context of her failure to keep appointments for visits and their infrequency. This background would make Stephen’s adjustment to respondent even more painful and difficult than that of other children who have been in foster homes for extended periods, and would increase the stress and strain on respondent of assuming his care. The fact that Stephen is without a father or other relative willing to assist in the physical, financial and emotional burden of his care is another adverse fact.
Moreover, while respondent mother’s symptoms currently are abated, she is again employed, and her demeanor on her last court appearance was composed and competent, even now her plan for living arrangements for Stephen is unrealistic. Further, while the mere fact of illegitimacy and a child’s lack of relationship with a father are obviously insufficient in themselves *670 to justify Ms removal from Ms mother, certainly this lack can be considered in determining what custody best serves the child’s moral and temporal interests. Under all the circumstances the court believes that the probability of respondent’s establishing and continuously maintaining a home for Stephen in which he could develop in an adequate manner, is practically nil.
The results of a transfer of legal custody to petitioner must also be appraised. For, this court holds that the judicial function is greater in a permanent neglect case than in the type of proceeding at issue in Matter of Jewish Child Care Assn. (5 N Y 2d 222), where the court rested on the assumption that the infant will be properly cared for under the direction and control of the agency.[6]
Here a precise estimate of Stephen’s future is possible because it is apparent from petitioner’s records as well as its explicit ..statement to the court that the result of a transfer of his custody will be his adoption by the foster parents in whose care he has been continuously since December 3, 1964, when he was 22 months old.
The ongoing record, compiled on the basis of regular visits by petitioner to the foster home for over four years — biweekly during some periods — shows without doubt that Stephen is a well-adjusted and well-developing, happy, loved and loving member of this family, which consists of husband, wife, and their natural son, who is 10 years older than Stephen. By adoption Stephen can finally attain a secure, permanent, unequivocal place as a member of a family that wants and loves him and has consistently, continuously and responsibly nurtured his development. Through his adoption his foster parents will be enabled to treat him and to plan for him unequivocally as their own son, rather than having the obligation to keep their relationship equivocal because of his mother’s claim to him (see Matter of Jewish Child Care Assn., pp. 229-230, supra). Not only, therefore, does the transfer of custody serve Stephen’s moral and temporal interests but indeed a denial of petitioner’s application would inflict a cruel deprivation. The right of the child to a secure and nurturing home here predominates over the right of the biologic parent. Custody forthwith transferred to petitioner.

. Cf. Zemel v. Rusk, 381 U. S. 1, 11-12; Udall v. Tallman, 380 U. S. 1, 16-18; Matter of Lockport Union-Sun v. Preisch, 8 N Y 2d 54, 58; Ferraiolo v. O’Dwyer, 302 N. Y. 371, 376.

. As to the statutory purpose, see Governor’s Message, approving chapters 448 to 450 of the Laws of 1959 (from which article 6 of the Family Court Act is derived): N. Y. State Legis. Annual, 1959, p. 415.

. The court will not determine the issue of whether the agency made “diligent efforts ” to encourage the parental relationship during Miss B.’s hospitalizations. The record is not sufficiently clear in regard to its conduct during these periods to warrant consideration of the difficult question of the type of efforts to maintain the parental relationship an agency should undertake, consistent with its duty to consider a child’s welfare, while a mother is in a mental hospital.

. Miss B.’s symptoms were extreme inertia (staying in bed continually), failure to eat and inability to sleep, failure to take care of ordinary bodily needs, apprehensiveness, and some degree of incoherence.

. An unfortunate result of the statutory requirement as to the parent’s physical ability during the period of her neglect is to be noted: The more continuous the parent’s incapacity, the less the power of the court to free the child for adoption. That is, if Miss B.’s hospitalization had been continuous so that there had been no “ period of more than a year ” when she had been physically able to maintain contact with Stephen, the statute would not apply. In this respect as well as with respect to the difficult proviso that the agency must attempt to maintain the parental relationship whether or not healthy for the child (see n. 3), the New York statute is more restrictive than that of a number of other States. (See Matter of Jones, 59 Misc 2d 69, 73, n. 5.)

. 5 N Y 2d 222, 229; affg. 6 A D 2d 698, 699. And it is to be noted that the Court of Appeals was divided 4 to 3, and the Appellate Division 3 to 2.