In the Matter of the Guardianship of STAR L. WHITTEN, an Infant. MARY W. STRINGFIELD, Appellant.

First Department, May 10, 1984

### APPEARANCES OF COUNSEL

*David J. Lansner* of counsel (*Lansner & Wendt,* attorneys), for appellant.

*Helen L. Buttenwieser* of counsel (*London & Buttenwieser,* attorneys), for Leake & Watts Children's Home, petitioner-respondent.

*Wendy Sue Lauring* of counsel (*Lenore Gittis,* attorney), *Law Guardian,* for infant child.

### OPINION OF THE COURT

KASSAL, J.

This is an appeal by appellant Mary Whitten Stringfield, from the order of disposition which permanently terminated her parental rights and transferred custody and guardianship of Star Leslie to petitioner, Leake & Watts Children's Home, jointly with the Commissioner of Social Services.

We agree with the determination of the Family Court that there was clear and convincing proof that appellant had failed and neglected to maintain contact with or plan for the future of the child for a period of more than one year

following the date the child came into the care of the agency, notwithstanding petitioner's diligent efforts to encourage and strengthen the parental relationship (Social Services Law, § 384-b, subd 7, par [a]). As found by the Trial Judge, appellant's plan was tenuous and unrealistic, with no positive, affirmative steps taken "to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent." (Social Services Law, § 384-b, subd 7, par [c].)

Appellant's child, Star Leslie, was born July 19, 1979. One week later, the mother brought the child to her foster parents, Mr. and Mrs. Harden, who were to care for her until appellant could do so. Within a few weeks appellant departed from the Harden Home, leaving the child behind, whereupon the Hardens sought reimbursement as foster parents and, at Mrs. Harden's request, appellant signed a voluntary surrender agreement. The child entered foster care with the same Hardens in August, 1979. Thereafter, during the last four months of 1979, appellant visited the child six times and, in all of 1980, there were only six visits, on January 12, February 15, April 21, August 21, and October 6 and 8, 1980, the last four being clinic appointments at the agency. In December, 1980, appellant moved to her sister's home in Yonkers, did not apprise the agency of her whereabouts and maintained no contact with petitioner until June, 1981.

The first proceeding to terminate appellant's parental rights was instituted in February, 1981 and, after the initial hearing held in June, 1981, when appellant expressed a willingness to care for her daughter, the petition was withdrawn. On December 17, 1981, the child was returned to the mother. Less than one month later, however, on January 13, 1982, appellant returned the child to the Hardens, at which time the child was found to have serious diaper rash. At the time, appellant had been living with Robert Stringfield, whom she later married during the period the fact-finding hearing was held.

The record confirms the Family Court's finding of neglect and failure to plan for the future and the order of disposition entered thereon. This conclusion is supported

by the Legal Aid Society, serving as Law Guardian of the child. While the dissent challenges this as an inaccurate statement of the Law Guardian's position and, for that purpose, quotes the second sentence appearing on page 1 of the Law Guardian's brief on this appeal, the balance of the 25-page brief unmistakably reflects the Law Guardian's recommendation. The Law Guardian opines that "Star's rights and interests are best served by the order terminating appellant's parental rights and awarding custody to the respondent agency so that Star may be adopted." The Law Guardian's brief closes with this unequivocal statement of its position: "Thus, while disruption of the adoption plan may advance appellant's interests, it will not advance Star's interests. Star is entitled to the legal permanence and attendant emotional security of an adoption by her foster parents. The order freeing her for adoption is sound and should be affirmed."

Both appellant and Stringfield claimed that the child was taken to the Hardens during a snowstorm when the boiler of the building in which they lived broke, so that the apartment was without heat. According to the social worker, however, appellant told her a different story — that she and Stringfield had a fight, the police had been called and Stringfield had ordered her out of the apartment. This account was confirmed by the police "sprint" report, recording a response to an incident at the premises involving a female with a knife. It further appears that two days after returning to the Harden home, Mr. and Mrs. Harden accompanied appellant to Stringfield's apartment to retrieve her belongings but, when appellant never came downstairs, the Hardens returned home without her. They alone continued to care for the child. This hardly appears to be the "stable" relationship and healthy and mature atmosphere conducive to normal child rearing, as suggested by the dissent.

Thereafter, on January 21, 1982, appellant sought the agency's permission to resume the care of her daughter. While the agency did permit visitation, it directed Mrs. Harden not to return the infant to appellant. Subsequent to the return of the child to the Hardens in January, 1982, there were five visits by the mother, on February 2, May

30, June 20, and July 2 and 4, 1982. This permanent neglect petition was filed February 17, 1982. Following the fact-finding hearing in July, 1982, the child was removed from the Harden home since Mrs. Harden had to be hospitalized. The infant was placed in a preadoptive home with another couple, with children, and where she now resides.

Contrary to the intimation by our dissenting colleague, there was not only "one incident" of neglect here. The relationship evinces a pattern of continuous neglect and an utter failure to plan for the future of the child. As found by the Trial Judge, "[t]he record has shown quite clearly that there is a lack of insight; there is a lack of judgement [*sic*]; there is a lack of consistency." The finding, to a large extent, was based upon the trial court's assessment of credibility, a determination with which we are reluctant to interfere. The Family Court Judge, having observed the demeanor of the witnesses first hand, is in far better position to make an on-the-scene evaluation of creditability (*Matter of Layton v Foster,* 61 NY2d 747; *Northern Westchester Professional Park Assoc. v Town of Bedford,* 60 NY2d 492, 499; Siegel, NY Practice, § 529, pp 731-732).

Section 384-b (subd 7, par [a]) of the Social Services Law defines " 'permanently neglected child' " as "a child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so". Section 384-b (subd 7, par [c]) of the Social Services Law defines " 'to plan for the future of the child' " as taking "such steps as may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent. The plan must be realistic and feasible, and good faith effort shall not, of itself, be determinative." Before parental rights may be terminated, the proof offered must be "clear and convincing" (*Santosky v Kramer,* 455 US 745).

The record establishes that for more than one year after the child came under the care of the agency, appellant

failed to plan for the child's future. The statute requires formulation and action upon a feasible and realistic plan (*Matter of Orlando F.,* 40 NY2d 103, 110). As far as appears, appellant had no plan, maintaining infrequent and sporadic contact with the child over an extensive period, with no visits during periods of several months. Clearly, she has demonstrated an utter failure to develop a meaningful plan for the child's future. Some affirmative action on her part was necessary, beyond uncommitted and infrequent contacts and mere expressions of concern for or desire to care for the infant.

We disagree with the dissent that the evidence was equivocal. To the contrary, the proof of neglect and failure to plan is clear and most convincing. In addition to other overwhelming proof, Dr. Ruth Cohen, a psychiatrist associated with the Family Court Mental Health Services, was an objective and disinterested witness. Her personal evaluation, based both on a review of records and an interview, concluded that appellant was unable "to lead a normal functioning aspect of life to deal with appropriate insight and judgement [*sic*] in terms of everyday kinds of matters that are necessary for normal functioning." She carefully diagnosed appellant's personality traits and opined that appellant had "no insight into her problems" and tended to "externalize blame" by ascribing fault to the agency for having assumed custody over the child.

On this record, it appears that appellant never developed a real relationship with the child. The trial court found that her conduct between January, 1980 and June, 1981 evinced a failure to plan for the child's return. The statutory period provided for in section 384-b (subd 7, par [a]) of the Social Services Law contemplates any one-year period during the child's placement and this need not be the year preceding the filing of the petition for permanent neglect (see *Matter of Norma Jean K.,* 81 AD2d 919). At best, the return of the child to the mother in December, 1981 lasted for only a few weeks, the Hardens thereafter resuming the care of the infant. Her subsequent voluntary abandonment of her daughter in favor of Stringfield, after she had allegedly gone to retrieve her belongings, together with the lack of contact during the ensuing period in 1982,

further evidence the absence of any meaningful plan. Furthermore, it does not appear that appellant attempted to secure employment, other than during the four or five months in 1982 when she worked in the energy office in a job provided her through public assistance. Her other experiences, babysitting on a part-time basis for a neighbor, do not operate as a substitute for her failure as a parent to plan for her child's future.

The absence of any real or meaningful relationship with the infant is reflected in the report of appellant's visits with the child. As was reported by the social worker, Marianne Cohen, appellant is "usually very passive * * * sits and smokes cigarettes and talks to child occasionally * * * does not play with the child * * * or interact in any meaningful or emotional way." Of significance is the report of the December 23, 1982 visit, after a decision on the fact-finding hearing had been issued but before the disposition hearing was held. The mother spent most of the time teasing and snatching toys away from the child, although she was told by the social worker that Star disliked being teased. It was reported that the child at one point told her mother to "get out" and told appellant, "I'm not your friend anymore", whereupon the mother responded, "then I'm not your friend either." It was further reported that although the child cried upon being separated from Mrs. Harden, she "does not get emotional about" and is "indifferent to" appellant's visits, and also is not upset when appellant leaves. This is in sharp contrast to the excellent adjustment which the child has currently made in the preadoptive home of her present foster parents, who have treated her "with much warmth and understanding and intelligence."

On this record, the pattern of neglect over a long period of time and the absence of any definitive plan for the child's future clearly militate against affording the parent an additional opportunity to do what she has been reluctant or unwilling to do in the past. Under the circumstances, with due regard for the paramount concern of the best interests and welfare of the child, we agree with the determination which terminated appellant's parental rights (cf. *Matter of Bennett v Jeffreys,* 40 NY2d 543; *Matter of Dickson v*

*Lascaris*, 52 NY2d 894). Star has already experienced one painful separation from the Hardens. She is now well adjusted with her foster parents, who apparently love her and whom she regards as her new psychological parents. Another separation will be a wrench to her emotional security. For her development, continuity of this relationship is essential.

We share to the same degree the profound concern of our dissenting colleague as to the critical nature of the issues raised and determination to be reached in Family Court neglect proceedings, both in terms of general considerations and the specific situation at bar. The issue of termination of parental rights is always most troublesome. Nor do we disagree at all as to the absolute necessity to safeguard the fundamental rights of litigants and ensure procedural due process. Aside from serving as a statement of general social policy, however, the conclusions expressed by the dissent are unwarranted and inapplicable here. On this record, there was no denial of due process and, furthermore, there is no such claim by appellant. There were two extensive hearings held, presided over by an experienced Judge; the fact-finding hearing is contained in a transcript of 96 pages, the dispositional hearing, 113 pages; all parties appeared and were effectively represented by able counsel, the child had separate counsel in that Legal Aid Society served as Law Guardian; and there is not the slightest charge by the respondent of a denial of any procedural right in connection with the holding of the hearings. All parties were accorded a full panoply of their rights, including the right to call any witness and fully cross-examine those who testified at the hearings.

While we fully appreciate the views of our dissenting colleague, the sentiments expressed in the last paragraph of the dissent are inflammatory and irrelevant to the disposition of this appeal. The proceeding was neither arbitrarily tried nor decided, nor is it in any way demonstrative of a "star chamber proceeding". The issues were fully and fairly tried by competent counsel and an able jurist and the intimation that the court is an intruder and should refrain from taking appropriate action in these cases would amount to an abdication of the judicial respon-

sibility inherent in our office. The judicial disposition which accords with due process can hardly be equated with the "arbitrary midnight 'knock on the door.'"

Accordingly, the order of disposition of the Family Court, New York County (Bruce M. Kaplan, J.), entered April 8, 1983, which permanently terminated appellant's parental rights and transferred custody and guardianship to petitioner, Leake & Watts Children's Home, jointly with the Commissioner of Social Services, should be affirmed, without costs or disbursements.

Asch, J. (dissenting). The majority has seen fit to affirm the order of the Family Court which terminated the rights of respondent, Mary Whitten Stringfield, as mother of Star Leslie, on the grounds of permanent neglect. It is my opinion that the order which divests the mother of her child should be reversed and the petition dismissed.

The dispositive order of the Family Court is not simply an award of money damages. It will significantly determine the lives of many people. Because the termination of parental rights is so significant, the Social Services Law requires punctilious compliance with its terms before these rights may be ended.

On appeal, appellant contends that petitioner did not establish by clear and convincing proof that appellant had permanently neglected her child. In support of her position, appellant argues that: Star was not in the care of an authorized agency; appellant did not fail to plan for the return of her daughter; and petitioner did not make diligent efforts to strengthen the parental relationship.

Section 384-b (subd 7, par [a]) of the Social Services Law provides, *inter alia:* "For the purposes of this section, 'permanently neglected child' shall mean a child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child."

A review of the evidence presented and the testimony at the dispositional hearing raises a serious concern that petitioner agency did not establish by clear and convincing evidence that appellant had permanently neglected her child. There are several unresolved questions presented in the testimony which make the Family Court's determination, to terminate appellant's parental rights, troublesome.

At the outset, it is questionable whether appellant ever intended for Star to be placed in foster care, whether she understood the legal ramifications of signing the voluntary placement document. The situation is compounded by the fact that when appellant first gave birth to Star and found that she could not take care of her, the people she turned to were the Hardens, her own foster parents, who she regarded as her parents. It seems fairly apparent that appellant signed the voluntary placement document simply to enable the Hardens to obtain financial assistance to care for Star. At that point, Star was under the care of the Hardens, who were also official foster parents for petitioner agency.

On December 17, 1981, Star was discharged to her mother and returned by her to the Hardens on January 13, 1982. No new document was signed with petitioners authorizing foster care. Based upon these facts, it is fairly arguable that Star was not actually in the care of petitioner, but was residing with the Hardens under a private arrangement.

Petitioner agency's contention that the "legality" of a child's placement is irrelevant provided the child is actually in the care of an authorized agency (*Matter of Mickey B.*, 65 AD2d 603), is not persuasive. It is questionable, in view of the circumstances here, inasmuch as the Hardens were regarded by appellant as her parents, whether Star was actually in the legal care of the agency. *Mickey B.* (*supra*) is clearly different from the instant case. In *Mickey B.*, the child had been placed under a neglect petition and the agency merely failed to file requests for extension of placement. In addition, the parents made no effort to regain custody.

There was no "clear and convincing" showing that the child had been in foster care with the petitioner agency for

a period of more than one year (see Social Services Law, § 384-b, subd 7). In addition, there was no showing that the child was actually in foster care at the time the petition was brought. There is no basis for a permanent termination proceeding when the child is no longer in foster care (see Social Services Law, § 384-b, subd 7, par [a]; Family Ct Act, § 614, subd 1, par [b]). It seems significant that the majority ignores this threshold issue of whether the child was in the care of the petitioner agency or residing with the Hardens under a private arrangement at the relevant times.

A second weakness in the position of the agency is that the evidence presented by it, in support of its claim that appellant failed to plan for the return of her daughter for a period of more than one year, is equivocal, at best.

Section 384-b (subd 7, par [c]) of the Social Services Law defines planning for the future of one's child as taking "such steps as may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent."

Concededly, appellant failed to plan for Star before the agency brought on the first neglect petition. Appellant left Star with the Hardens in August, 1979, when Star was one week old. She continued to visit with Star up until about October, 1980, when she moved and refused to give the agency her address. As such, petitioner brought on the first proceeding in February, 1981, which was well over one year later. However, from the time of the first hearing in June, 1981 until the time Star was discharged to appellant in December, 1981, and the time Star was returned to the Hardens in January, 1982, it can be concluded that appellant planned for Star's future. The instant proceeding was commenced by petitioner two months later, in March, 1982.

It is clear that appellant's plan, which was to marry Robert Stringfield with whom she had been living since 1979, and to obtain adequate housing and public assistance, was sufficient to satisfy the agency, since it discharged Star to appellant's custody. Exactly when the formal marriage ceremony took place is irrelevant. We live

in a society in which stable relationships may subsist between persons who are unmarried. The formal imprimatur of a certificate is not the guarantee of a good home. In any event, appellant *did* thereafter marry Mr. Stringfield, at some time, *did* obtain adequate housing and added Star to her public assistance budget. Accepting, as petitioner contends, that one month later the plan failed because of a dispute between appellant and Stringfield involving the police, with appellant and Star being thrown out of the apartment on a snowy January night, it cannot be concluded that this one incident was sufficient to justify the agency's decision not to allow the child to return to her mother and to abandon all efforts to strengthen the parental relationship. This may have been a temporary setback for appellant, but she did work out her relationship with Mr. Stringfield. No more than one week later, she requested that Star be returned to her home.

While there are cases which hold that the year of failure to plan required by the statute need not be the year ending with the institution of a permanent neglect proceeding, such are inapplicable to the case at bar. In fact, in *Matter of Norma Jean K.* (81 AD2d 919, 920) which is cited by the agency, where the mother by her conduct and statements — getting married, setting up a home, indicated her effort to stabilize her life so as to provide for the eventual return of her child, the court said as follows: "However, the construction of the permanent neglect statute concerning an affirmative finding as to more than a year of agency efforts and parental failures, at any period of time during the child's placement, should not 'lead to injustice in the event that a parent's sense of responsibility toward the child has developed in the interim before the proceeding' (*Matter of Jones,* 59 Misc 2d 69, 71). The court is obliged to consider this development in its final disposition of the petition."

The final point is that there was insufficient evidence presented that the agency, on its part, used the required diligent efforts needed to strengthen the parental relationship. While the agency did continue to set up appointments for appellant's visits with Star, it abandoned all other

efforts so far as appellant was concerned, once appellant returned Star to the Hardens in January, 1982.

The majority in its assertion that the record confirms the finding of neglect and failure to plan for the future states that: "This conclusion is supported by the Legal Aid Society serving as Law Guardian of the child." This statement of the Law Guardian's position is inaccurate. The Legal Aid Society's brief does not even argue that such a showing was made, or present any argument in support of it, but simply states that "*if* this Court concludes that the Family Court's finding of permanent neglect *is* supported by legally sufficient evidence, the law guardian urges affirmance of the order terminating parental rights" (emphasis added). The discussion by the Legal Aid Society and the majority as to the "best interests" of the child is irrelevant because that question is not reached in the absence of a valid finding of permanent neglect (see *Matter of Bennett v Jeffreys,* 40 NY2d 543, 549).

All in all, while appellant, herself a foster child, was initially unable to care for Star, probably due to her young age, the fact that she was living alone, her financial situation and her own emotional problems, it does appear that she made substantial efforts to stabilize her life. The fact that she has borderline intelligence and tends to blame others for her problems does not mean that she is unable to care for her child. It can be concluded that the Family Court erred in making a dispositional order terminating appellant's parental rights.

The majority relies in large part upon the testimony of Dr. Ruth Cohen, a psychiatrist associated with the Family Court Mental Health Services, who it categorizes as "an objective and disinterested witness." However, the recommendation of Dr. Cohen was based upon extensive materials provided by petitioner besides only one interview with respondent lasting about 45 minutes. No list of the materials furnished by the agency was given respondent. No opportunity was had by respondent, therefore, to refute those materials or effectively attack the recommendation based upon them. The psychiatrist conducted no independent investigation of the facts, and did not speak to anyone with favorable information regarding the respondent. It

appears strange that this "objective and disinterested witness" did not speak to the Hardens, who had the greatest firsthand knowledge of respondent's behavior as a child and an adolescent.

The extensive reliance by the psychiatrist upon parts of the case record, filled with possible hearsay and opinion, with no notice and opportunity for respondent to examine this material, was in violation of one of respondent's basic rights (see *Goldberg v Kelly,* 397 US 254, 267-268). Thus, the Court of Appeals has indicated that even where the entire case record was offered into evidence at a fact-finding hearing, the better practice would have been for petitioner to have given respondents in that case notice and an opportunity to examine the file prior to the hearing (*Matter of Leon RR,* 48 NY2d 117, 123).

Respondent here was in a similar situation. She requested a continuance to deal with the addendum psychiatric report, which was based upon agency material, and to obtain another psychiatric evaluation. This continuance should have been granted her as a matter of "fundamental fairness" (*Matter of Leon RR, supra,* p 124).

In addition, the psychiatrist stated in her report that respondent is unable now or in the foreseeable future to assume the care of her daughter, due to her mental illness. However, this proceeding was not one for termination of parental rights on the ground of mental illness (cf. Social Services Law, § 384-b, subd 4, par [c]). If respondent did have a mental illness which impaired her ability to care for her daughter, which the agency claimed to have been aware of for many years, it was under a duty to provide respondent with assistance in getting treatment for that specific problem (*Matter of Star A.,* 55 NY2d 560). Yet no evidence was adduced that the agency offered respondent any psychiatric services or advised her that she needed them. Also, the psychiatrist's report hardly supports her diagnosis of current mental illness.

The errors and omissions contained in the record, the lack of fundamental due process rights afforded respondent raise serious questions.

No one is wise enough to know all the secrets of good parenting, especially where the alternatives are limited

and, in any event, the prospects are not too encouraging. It is therefore an act of *hubris* to cut a mother and child asunder without overpowering justification. In a society which prides itself on its concern for those who need help, "good intentions" are not enough. It would be anomalous if procedural due process, which protects the most heinous criminal, were denied Star Leslie Whitten and her natural mother (see *Stanley v Illinois,* 405 US 645).

"In all of this troublesome and troubled area there is a fundamental principle. Neither law, nor policy, nor the tenets of our society would allow a child to be separated by officials of the State from its parent unless the circumstances are compelling. Neither the lawyers nor Judges in the judicial system nor the experts in psychology or social welfare may displace the primary responsibility of child-raising that naturally and legally falls to those who conceive and bear children." (*Matter of Bennett v Jeffreys,* 40 NY2d 543, 552, *supra.*)

The historic role of the Judge and lawyer in America has been to protect individuals from the arbitrary midnight "knock on the door," the "star chamber proceeding" and from other State persecution. As government has taken on more social welfare functions, the legal establishment must also act as a bulwark to protect individuals from the tyranny of benevolence.

SILVERMAN, J. (dissenting). With much misgiving as to the welfare of this child, I am constrained to agree with Justice Asch that the order should be reversed in the light of the Court of Appeals decision in *Matter of Sheila G.* (61 NY2d 368). This of course relates only to termination of parental rights and not custody.

SULLIVAN, J. P., and BLOOM, J., concur with KASSAL, J.; ASCH and SILVERMAN, JJ., dissent in separate opinions.

Order of disposition, Family Court of the State of New York, New York County, entered on April 8, 1983, affirmed, without costs and without disbursements.