In the Matter of RAY A. M. (ANONYMOUS). SPENCE-CHAPIN ADOPTION SERVICE, Appellant; JULE M. SUGARMAN, as Commissioner of Social Services, Appellant; SHIRLEY G. M. (ANONYMOUS), Respondent.

Second Department, May 27, 1975

*Simpson Thacher & Bartlett (Ronald L. Ginns and Ronald G. Russo on the brief), for Spence-Chapin Adoption Service, appellant; Adrian P. Burke, Corporation Counsel (L. Kevin*

*Sheridan* and *Helene M. Holmes* on the brief), for Jule Sugarman, appellant (oral argument by *Ronald L. Ginns* for appellants).

*William E. Hellerstein* and *Charles Schinitsky (Michael Gage* and *David Waldman* of counsel), for Ray A. M. (Anonymous).

*William L. Reese, Jr.,* and *Henry C. Miner, III (Bedford-Stuyvesant Community Legal Services Corporation),* for respondent.

*Per Curiam.* "Under the particular facts and the totality of circumstances" *(Matter of Klug,* 32 AD2d 915, 916), we hold that the infant herein is a permanently neglected child, as defined in section 611 of the Family Court Act, and that the child's moral and temporal interests require that the custody of the respondent, her natural mother, be terminated permanently (Family Ct. Act, § 614, subd 1, par [e]).

The permanent neglect petition was filed by the petitioner Spence-Chapin Adoption Service on December 3, 1971. At that time the child was four years old; for the preceding two and a-half years she had been in the custody first of the Bureau of Child Welfare, and thereafter, since February 17, 1971, with Spence-Chapin. The child, who is now seven years old, has, since the latter date, been in the care of the same foster parents.

The voluminous record which covers 19 hearings, beginning June 18, 1969, portrays a picture of an aggressive, paranoid and immature mother who interspersed long periods of neglect (by failure to maintain contact with the supervising agency for visitation) with sudden, hysterical demands that the child be returned to her. Attempts by caseworkers to contact the respondent were frustrated by her constant changes of address, most of which were not communicated to the agency.

On one occasion, when the Bureau of Child Welfare permitted the child to be taken to the respondent's home, the infant was admitted to a hospital as a battered child four days later. On August 27, 1971 the Family Court Judge, in response to the respondent's application for the immediate return of the child, ordered Spence-Chapin to permit 15 visits by the respondent up to October 8, 1971; on that latter date she was to be permitted to take the child home for the weekend. Nevertheless, the respondent made only two regular visits prior to

October 1; on that date she insisted on taking the child home a week earlier than scheduled. She was permitted to do so, but refused to return the child on the following Monday. This resulted in the issuance of a warrant and the arrest of the respondent.

At that point petitioner Spence-Chapin concluded that the child's best interest would be furthered by her remaining with her foster parents, and concomitant therewith discontinued efforts to encourage and strengthen the parental relation. This was followed by the permanent neglect petition herein.

After the respondent's arrest in October, 1971, she had been required to appear at a hearing in the Family Court on October 15, 1971 on Spence-Chapin's application for an extension of placement. That hearing (later consolidated with hearings on the permanent neglect petition) was continually adjourned because of the respondent's nonappearances. She did not appear until September 19, 1972; hearings in the consolidated proceedings were held, beginning November 15, 1972.

The record impels the conclusion that the respondent has failed, for the entire time since May 29, 1969, "substantially and continuously or repeatedly to maintain contact with or plan for the future of the child" (Family Ct. Act, § 611). The respondent's behavior during her sporadic contacts with the agency and the child did not serve the purpose of easing and adjusting the child to return to her; they constituted a disruptive and harmful factor to the child's well-being, far beyond that normally to be expected in such a delicate situation.

Section 611 of the Family Court Act requires the agency to exert diligent efforts to encourage and strengthen the parental relationship. This section was amended, effective June 25, 1971 (L 1971, ch 901, § 1) to add the phrase "when such efforts will not be detrimental to the moral and temporal welfare of the child." The record establishes that Spence-Chapin, and its predecessor in the care of the child, the Bureau of Child Welfare, had in fact initially, and for a long period of time, exerted diligent efforts to foster and strengthen the parental relationship. Such efforts, however, were not met with the cooperation of the respondent. The respondent's behavior on those occasions in 1970 and 1971 when she visited the child and when she took her home was such as to clearly demonstrate the correctness of Spence-Chapin's conclusion, in late 1971, that further efforts to encourage the parental relationship would be detrimental to the welfare of the child.

The testimony of the psychologist who examined the respondent in December, 1973 at the direction of the court, that of the psychiatrist who examined both the respondent and the child at the direction of the court, as well as that of the two psychiatric consultants retained by Spence-Chapin, show that there has been no change in the psychological and behavioral pathology, which is the basis of her failure to fulfill her parental obligations towards the child. Such testimony further supports Spence-Chapin's decision not to continue fostering the parental relationship.

This little girl is now seven years of age. She is still living in a condition of uncertainty about her life. This uncertainty has been caused by, and continues entirely because of, the emotional instability, life-style and neglect of her natural mother; it is in no way the fault of the adoption agency or the foster-care family. The child is entitled to know where her future lies and not to have the uncertainty continued by postponement of the decision for another year.

The foster home is stable and there is a desire to adopt. The child, if returned, would go to an unstable mother who has no husband and who has had three illegitimate children by different men. She would go to a home with no father figure and a life ahead which is likely to be supported, as the mother now is, on the welfare rolls.

This is not simply a case where the neglect by the parent may have been matched by the neglect of the agency to attempt the strengthening of the parental relationship (cf. *Matter of Anonymous,* 48 AD2d 696 [decided herewith]). It may be that the adoption agency could have tried harder to encourage the natural mother-child relationship in order to satisfy the most searching mind that no more could reasonably be done. However, we must not get lost in an analysis of the niceties of the precise degree of required diligence of effort where the life-style and apparent sociopathology of the mother (joined with her undoubted past neglect) indicate a bleak future indeed for the child. As stated in *Matter of Raymond "M."* (81 Misc 2d 70, 79), "The welfare of the child is not served if permanent termination is delayed in order to penalize the agency for its failure to make diligent efforts or in order to give the natural parent recompense against the agency in the form of a second chance."

Not to settle this child's future now, after hearings held

over a span of many years, would be an abdication of our primary duty of concern for the welfare of the child.

We therefore conclude that the orders of the Family Court which deny termination of the respondent's parental rights pursuant to section 611 of the Family Court Act should be reversed, on the law and the facts, and the petition granted. Our decision that the infant is a "permanently neglected child" renders moot the application for an extension of placement.

MARTUSCELLO, Acting P. J. (dissenting). To deprive a mother of her child by a decision that she has permanently neglected her child, and that re-establishment of the parental relationship would be detrimental to the welfare of the child, is one of the most awesome decisions that a court can make.

In *Matter of Bistany* (239 NY 19, 24), the court stated that a finding of abandonment requires "that by acts so unequivocal as to bear one interpretation and one only the parents manifested an intention to abandon the child forever. They may have weakly hesitated. They may have foolishly delayed. They may have drifted into a situation in which their desires and expectations were open to misconception. They may even have experimented a little, to test their own feelings. All that is not enough. They must be found to have renounced."

A decision as to permanent neglect should be uninfluenced by a comparison of the home environment of the foster and the natural parents. It must be based solely upon the unnatural behavior of the parent in truly, and apparently permanently, neglecting the child.

Both section 611 of the Family Court Act, which defines permanent neglect, and section 614, which specifies the required allegations of a permanent neglect petition, make a connection between the mother's failure to "maintain contact with or plan for the future of the child" for a period of more than one year and the diligent efforts of the agency. It must be shown that the mother's failure occurred "notwithstanding" the agency's diligent efforts, i.e., that the agency made diligent efforts and that, despite this, the mother failed to maintain contact. While I do not believe that the statute requires the agency to persistently continue its efforts to strengthen the parental relationship for one year where, after a period short of one year, it realizes its efforts are hopeless (see Gordon, The New York Permanent Neglect Statute, 46 St.

John's L Rev 215, 238), it does require proof that the mother's failure to contact and visit the child occurred "notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship".

The Family Court determined, as a fact, that the two agencies involved did not exert diligent efforts; that "the most that can be said * * * is that they were neutral or indifferent towards the respondent." I believe this finding is firmly supported by the evidence.

Spence-Chapin accepted responsibility for the child in January, 1971 and placed her in a foster home on February 17, 1971. The caseworker in charge did not know how to contact the respondent but, as stated in Spence-Chapin's case summary, this was not of pressing concern because "it was thought it would be best for Ray * * * if we did not have immediate contact with her mother so that she would be able to develop a sense of permanency and security in her new foster home." It was the respondent who initiated contact by calling Spence-Chapin to ask for visitation. Two appointments were made and were either canceled or unkept. However, on April 28, 1971, the respondent called to say that she was coming to the agency that day, and she did come.

It was apparently this April 28, 1971 interview (together with the Bureau of Child Welfare's records which had been sent to Spence-Chapin) which determined the agency not to permit visitation except by court order, i.e., not to "encourage and strengthen the parental relationship". The respondent came to the interview smelling of liquor; the caseworker's report states that the respondent objected to answering questions, stating that she was fed up; that she was verbally abusive and complained that the agency had no right to take her child; that she displayed a "childish bewilderment"; and that when she was told that the taking had been by court order, she threatened to have the Judge shot down. The caseworker's summary includes the following: "She told me that she was very lonely and often drank because she missed the children so much [she had a second child in Willowbrook State Hospital] * * * She told me she could not live a normal, happy life until her children were home with her." The caseworker testified that the interview ended with the suggestion to the respondent that she obtain legal advice if she wanted to contest the placement of the child in foster care

and to clarify her visiting rights. It should be noted that at that time the respondent was 17 years old.

After that meeting, Spence-Chapin had no further interviews with the respondent and allowed no visits, except by court order. The first of such court-ordered visits was held on August 20, 1971, 16 months after the last previous time the respondent had seen the child.

Spence-Chapin claims that its efforts to strengthen the parental relationship are evidenced by its attempt to follow the schedule of 15 visits directed by the court on August 27, 1971. The caseworker, however, conceded in her testimony that no thought was given to rehabilitating the mother-child relationship and that she had been unaware of the statutory concept of diligent efforts to encourage that relationship. In fact, the caseworker's supervisor testified that the agency's primary interest was in the child-foster parent and not the child-natural parent relationship.

I agree with the Family Court's conclusion that the agencies did not make diligent efforts to encourage and strengthen the parental relationship and that there was no showing that such efforts would have been detrimental to the welfare of the child. Spence-Chapin's policy was to let the child settle into her new foster home; its sole "diligent" effort was to accept the August 27, 1971 court-imposed visiting schedule. I do not believe that the mere acceptance of a court mandate to allow visitation can constitute "diligent efforts". In any event, such efforts were too late to meet the statutory requirement as they came *after* the 16-month period of parental failure to visit. They cannot be regarded as efforts, against which, *notwithstanding,* there was a parental failure to visit.

I cannot agree that Spence-Chapin properly determined that "diligent efforts" would have been detrimental. The original neglect finding, as a result of which the respondent was first deprived of custody, was made in 1969 when the respondent was 15 years old; it was to the effect that the respondent and her mother kept a filthy home. Two Kings County Hospital psychiatric examinations of the respondent in 1970 and 1971 indicated no psychopathology or psychiatric contraindication of her care of the child. The Spence-Chapin personnel failed to consider, when the April 28, 1971 interview was held, that this not too intelligent 17-year-old unmarried mother of two children (one of them brain-damaged) might well have been insecure and hostile out of frustration, and that she might

have arrived inebriated in order to fortify herself in a strange environment. At the least, Spence-Chapin should have given her another chance by scheduling another meeting or by referring the case to another caseworker. Undoubtedly, its failure to do so was the result of its decision to concentrate on the foster family. I believe Spence-Chapin gave up too soon.

I do not believe that an adoption agency may set itself above the law and decide that diligent effort is unnecessary. I believe that its assertion that such efforts would have been detrimental is an afterthought; that in fact it had concluded, from the records forwarded to it by the Bureau of Child Welfare and the one interview of April 28, 1971, that the child's welfare required concentration on the foster family and *discouragement* of the mother's efforts at contact with the child.

Section 611, at the least, requires that the natural parent be given a chance at redemption. The respondent was given no such chance. I therefore believe that the infant is not a "permanently neglected child" as defined by section 611 of the Family Court Act.

This leaves for disposition the status of the child on the extension of placement which had its genesis in the 1969 neglect petition. Under subdivision (b) of section 1055 of the Family Court Act, after the initial 18-month placement of a neglected child, there may be successive extensions of one year each.

I do not believe that the testimony of the psychologist and the three psychiatrists demonstrates the emotional unfitness of the respondent to care for the child. As noted in the Family Court's decision, they were primarily evaluating the respondent as though the question were whether she or the foster parents should have custody; their conclusions appeared to be based on their belief that it would be damaging to remove the child from the foster home where she had resided comfortably for three years. On the other hand, two Kings County Hospital psychiatric reports stated no contraindication to the respondent's care of the child.

Nevertheless, I do not entirely discount the testimony of the psychologist and psychiatrists. In view of my conclusion that Spence-Chapin has not demonstrated that the infant is a permanently neglected child, in large part because it failed to make diligent efforts to encourage and strengthen the parental relationship, I believe the proper determination is to

extend temporary placement for one year; that during this year, Spence-Chapin should make the afore-mentioned efforts; and that at the end of such year, Spence-Chapin, should it so choose, may again petition to have the infant declared a permanently neglected child. Upon the hearing to be held on such new petition, evidence of the respondent's behavior during the year, and testimony of psychiatrists and psychologists as to the respondent's present attitude vis-á-vis the child, would be relevant. As the record now stands, we do not know whether or not the respondent is *presently* capable of caring for the child she so desperately (and naturally) wants.

CHRIST, MUNDER and SHAPIRO, JJ., concur in *Per Curiam* opinion; MARTUSCELLO, Acting P. J., dissents in an opinion and votes to modify the orders by extending the placement of the child for an additional period of one year.

Orders of the Family Court, Kings County, dated June 3, 1974 and July 10, 1974, respectively, reversed, on the law and the facts, without costs, and petition to terminate custody on the ground of permanent neglect granted. The proceeding is remanded to the Family Court for the making of an award of custody pursuant to the provisions of section 634 of the Family Court Act.