Felice K. Shea, J.
In these proceedings joined for trial the petitioning agency seeks first, to extend placement of two of respondent mother’s children pursuant to subdivision (b) of section 1055 of the Family Court Act; and second, to terminate respondent’s parental rights to her other four children in order to free them for adoption as provided for in article 6 of the Family Court Act.[1]
The placements of Hilda and Juana have been extended for six months and a copy of the court’s order is on file. There remains the issue of the alleged permanent neglect of Pedro, Jose, Felix and Maria.
*484 At the close of the fact-finding hearing, respondent moved to dismiss on the ground that petitioner had not proved, by a fair preponderance of the evidence, that the agency had "made diligent efforts to encourage and strengthen the parental relationship”; nor that "the parent * * * notwithstanding the agency’s efforts, ha[d] failed for a period of more than one year * * * substantially and continuously or repeatedly to maintain contact with or plan for the future of the child[ren] although physically and financially able to do so”[2]. Respondent moved to dismiss on the further ground that she had been deprived of her constitutional right to due process of law in that section 622 of the Family Court Act permits a finding of permanent neglect to be based upon proof by a preponderance of the evidence.
Respondent’s motion is denied in all respects.
THE FACTS
The children herein were born out of wedlock and range in age from 5 to 13. They were placed with the Commissioner of Social Services, under the supervision of the petitioning agency, after a finding that they (and their two siblings) were neglected by both parents.[3] Pedro, Jose and Felix have been together in the same foster home since February, 1970; Maria joined her brothers in September, 1971. The foster parents are eager to adopt all four children; the children, in turn, have expressed a deep desire to be adopted. ,
The evidence before the court reveals that respondent is 30 years old, has never married, and came to New York City from Puerto Rico at the age of nine. She testified, through a Spanish interpreter, that she could neither read nor write, has never worked, and that she is supported by public assistance.[4] *485 Respondent stated that her varicose veins and an undefined stomach ailment prevented her from seeking employment. She saw no health barrier to the resumption of the care of her six children.[5] 6*She testified that the father of five of her children was Pablo V. but she was unable to recall who was the father of Pedro, her oldest child.[6] Respondent’s memory was equally poor with regard to dates; she was not able to give a coherent account of the time when events occurred or the order in which they happened.
It is undisputed that respondent visited her children more or less regularly, except for the period January to October, 1971 when she went to Puerto Rico to escape the physical abusiveness of Pablo V. with whom she was then living. Respondent did not contact the agency, her children or the court while she was away. Upon her return to New York, respondent visited the children once in January, 1972, but did not re-establish regular contact with them until June, 1972. By that time, the three boys had been in foster care, in the same home, for two and a half years, and the agency records, duly admitted into evidence pursuant to CPLR 4518, show that deep attachments had been formed between foster parents and children.
Sometime during 1971 or 1972, respondent’s relationship with Pablo V. ended. He had been in jail and, upon his release, apparently went to live with another woman. During 1971 or 1972, respondent went to Mobilization for Youth, an agency which provided supportive casework and legal assistance and which represents her in this proceeding. Respondent continued to seek medical and psychiatric help at Gouverneur Hospital where she had been known since 1969. A psychiatrist saw her in occasional crisis situations, and she was a member of a group therapy program, which she attended irregularly.
Respondent claimed that at all times she wanted all or some of her children returned to her. The psychiatrist and a worker from Gouverneur Hospital and a social worker from Mobilization for Youth corroborated that respondent expressed interest in her children, but were guarded in their assessment of any plan to resume care of all six children. Neither respondent nor the witnesses in her behalf presented the court with *486 any evidence that respondent had established a meaningful relationship with Pedro, Jose, Felix or Maria. Indeed, respondent admitted that Pedro had refused to talk to her for the 18 months preceding trial.
SECTION 614 (SUBD 1, PAR [c]) OF THE FAMILY COURT ACT: DILIGENT EFFORTS OF AGENCY
In determining whether the agency has met its statutory burden of encouraging and strengthening the parental relationship,[7] the court must consider "the particular facts and the totality of circumstances” of the case. (Matter of Klug, 32 AD2d 915, 916.) The statute provides no time limits and no specific guidelines, except that efforts to encourage the relationship shall not be undertaken when they are "detrimental to the moral and temporal welfare of the child.” (Family Ct Act, § 611, § 614 subd 1, par [c].)
As a general rule, the agency should make intensive efforts at the beginning of foster care placement to work with the natural family toward discharge. Supportive casework services to improve parenting ability and to assist with housing, medical or emotional problems should be attempted. Diligent efforts to foster the relationship should include, when possible,. frequent visits and overnight visitation at the parent’s home.[8] If it becomes apparent at the end of the one-year statutory period (Family Ct Act § 614 subd 1, par [d])[9] that the parent will not make plans to resume custody, then the agency must move promptly to free the child for adoption.
The agency, in carrying out its statutory mandate, must work always within the framework of the child’s safety and best interests. And the court, when weighing the evidence of permanent neglect at a fact-finding hearing, must also be ever concerned with the welfare of the child. Any other interpretation of section 614 (subd 1, pars [c], [d]) of the Family Court Act[10] would do violence to the purpose of the permanent *487 neglect statute, would be in conflict with case law (Matter of Ray A. M., 48 AD2d 161, afFd 37 NY2d 619; Matter of Raymond "M”, 81 Misc 2d 70; Matter of Wood, 78 Misc 2d 344; Matter of Jones, 59 Misc 2d 69) and might deprive children of equal protection of law.[11]
Turning now to a consideration of the efforts made by "the petitioning agency to foster respondent’s relationship with her children, the records of the agency and the testimony of the agency’s social worker show that at all times, until it was determined that this action should be commenced, visitation was made available to the respondent. However, pursuant to an order of this court, made to protect the children from Pablo V., visitation could be had only under the supervision of the agency and Pablo V. was excluded from seeing them. In the early years of the children’s placement, when intensive efforts could have been made to reunite mother with children, respondent chose to live with the man who had cruelly abused her children and who had assaulted her, forcing her, by her own testimony, to flee to Puerto Rico in fear for her safety.
The agency worked with the family by encouraging respondent to visit when she was available, by protecting the children from Pablo V. who sought to see them, by encouraging respondent to free herself from Pablo V. in the interest of both mother and children. A caseworker was present at each agency visit and, in addition, the worker visited respondent at home. Thus, during the first years of the children’s foster *488 placement, before the children became firmly rooted in their foster home, the agency fully discharged its statutory responsibility.
Between June, 1972 and October, 1974, when the agency finally determined that it would be detrimental to the children’s interests to permit further visitation, the evidence presents some elements of contradiction, and illustrates the damage that can be done to children when agency and parent alike fail to take affirmative action to insure what is every child’s birthright — a permanent, stable, loving and nurturing home.
The agency continued to allow visitation, but noted repeatedly in its records that respondent and the four children herein never established a meaningful relationship. Respondent frightened the children with lurid stories and related to them in immature and inappropriate ways. The children reacted with nightmares and emotional upsets. The oldest child, Pedro, who had been subjected to brutal beatings by respondent’s paramour, was reluctant even to see his mother. Nevertheless, the agency urged the foster family to prepare the children for maternal visits. The agency also fostered family unity by scheduling regular visits among the four children herein and the two sisters in another foster home. Vocational training programs were discussed with respondent and petitioner encouraged respondent to work with the other organizations that were providing her with services.
The petitioning agency has not been faultless. Records show that the worker assigned to the case for much of the time the children were in placement spoke no Spanish and communicated with respondent through an interpreter. Respondent testified to lack of rapport with this worker. The supportive services respondent needed to help solve her housing and health problems were supplied by other agencies. Respondent’s educational and vocational deficits have not been remedied, in spite of intensive efforts by these other agencies, and indeed, may not be amenable to remediation.
On balance, the agency has met its responsibilities. It is certain that on the evidence before the court, any further efforts to reunite mother and children would be both futile and detrimental to the welfare of the children. Too much time has passed and the children have become too deeply attached to their foster family. The court must weigh heavily that during the crucial early years of the children’s placement, *489 respondent lived with a violent and destructive man and returning the children to her would have endangered them. The agency’s efforts must be measured in the light of what was possible and what was in the best interests of the children. The diligent efforts requirement, as interpreted by the courts, has been met. (Matter of Ray A. M., 48 AD2d 161, affd 37 NY2d 619, supra; Matter of Raymond "M”, 81 Misc 2d 70, supra; Matter of Wood, 78 Misc 2d 344, supra.)
SECTION 614 (SUBD 1, PAR [d]) OF THE FAMILY COURT ACT: FAILURE TO PLAN
Pursuant to the requirements of section 614 (subd 1, par [d]) of the Family Court Act, the court finds that respondent has failed substantially to plan for the future of her children for a period of more than four years.
" 'Substantially plan’ means to formulate, and act to accomplish, a feasible and realistic plan.” (Matter of Stephen B, 60 Misc 2d 662, 668, affd sub nom. Matter of Behrman, 34 AD2d 527.) A failure to make realistic plans or to take steps to implement such a plan, supports a finding that children are permanently neglected. (Matter of Jones, 59 Misc 2d 69, supra.)
The court is mindful that respondent mother has evinced interest in her children as demonstrated by consistent visitation. Her actions meet the statutory requirement of maintaining contact. However, merely maintaining contact no longer serves to relegate children to perpetual uncertainty and foster care. Section 614 (subd 1, par [d]) of the Family Court Act was amended in 1973[12] to allow termination of parental rights if the parent fails either to maintain contact or to plan for her children. State Senator Joseph R. Pisani, chairman of the Temporary State Commission on Child Welfare, in a memorandum supporting the amendment, wrote: "[E]ven when there is substantial and continuous visitation, the parent or custodian may fail to take steps to end the foster care status of the child and restore the child to a homelife with the parent or custodian. A child is no less in limbo when kept in foster care year after year when the parent or custodian is physically and financially able to provide a home but fails to do so.”[13]
*490 Respondent’s actions fall short of the statutory requirement of planning when considered in the light of all the facts and when measured against the needs of her children. The evidence is overwhelming that respondent’s relationship with her children is superficial, and that the children have not gained from their contacts with her. Although at trial respondent expressed a desire to have her children returned to her, the credible evidence leads the court to conclude that she would be quite content to remain a mere visitor in their lives for the indefinite future. During the many years that the children have been in foster care, respondent took no steps to effect their return. There is uncontradicted evidence that on several occasions she was prepared to sign adoption surrenders for some or all of the children, but was deterred from doing so by considerations unrelated to their welfare.
As recently as January, 1975, respondent appeared in this court, represented by the attorney who represents her in this proceeding, in answer to petitions to extend foster care placement of all six children. Her attorney told the court: "Well, we are not saying that [the children] should not have the security of a long term foster placement * * * I am only asking this Court to order that this agency continue visitation on a regularly scheduled basis.”[14]
The 1973 amendment to section 614 (subd 1, par [d]) of the Family Court Act was aimed at preventing the precise situation that obtains here — children who remain in foster care because their mother will not provide a home for them, does not plan to take them home, but wishes merely to retain the right to visit them. The Appellate Division, Second Department, recently affirmed a decision of the Family Court which applied the 1973 amendment of the Family Court Act and freed a child for adoption where a mother was found to have failed to plan in spite of regular visitation over an extended period of time. (Matter of "Female” B. [Anonymous], 49 AD2d 615.) This court holds similarly, that respondent has failed to plan within the meaning of section 614 (subd 1, par [d]) of the Family Court Act.
CONSTITUTIONALITY OF STANDARD OF PROOF
Respondent, through her able counsel, argues that the *491 petition herein must be dismissed unless the allegations therein are proved beyond a reasonable doubt. Respondent submits that section 622 of the Family Court Act,[15] insofar as it provides for proof by a fair preponderance of the evidence in permanent neglect proceedings, fails to meet the due process standards of the Fourteenth Amendment to the United States Constitution.[16]
"The constitutional guarantee of procedural due process is not in any sense absolute in application but rather is relative to the interests at stake and the corresponding rights, constitutional or otherwise, of the respective parties.” (Matter of Ballay, 482 F2d 648, 653.)
While it is true that the interest of a parent in raising his or her child is substantial and has been accorded significant protection by this State (Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196; People ex rel. Kropp v Shepsky, 305 NY 465) and by the United States Supreme Court (Stanley v Illinois, 405 US 645), it is also true that when the interests of children and the interests of society in children have come in conflict with parental rights, the New York Legislature has shown increasing solicitude for the rights of children.[17]
The purpose of the permanent neglect statute is not punitive, even though a neglectful parent may suffer. The statute is remedial in nature, designed to rescue children from being "left in a state of uncertainty by being legally chained to parents who give little hope of ever acting as parents.” Mat *492 ter of Barbara P., 71 Misc 2d 965, 968.)[18] Section 622 of the Family Court Act along with the other provisions of article 6 of the Family Court Act is the result of a legislative balancing of competing interests.
Respondent correctly points out that the labels "civil” and "criminal” cannot be dispositive of constitutional due process rights. However, no cases have been brought to the court’s attention in which the "beyond a reasonable doubt” standard has been applied except where loss of liberty might result. Matter of Winship (397 US 358) applied the standard to juvenile delinquency proceedings, often denominated civil (see Matter of Charles G, 83 Misc 2d 388); and Matter of Ballay (482 F2d 648, supra), applied the stricter standard to a civil commitment proceeding, where again, personal liberty was threatened. Since respondent’s liberty is in no way affected by this termination proceeding, these cases are not analogous. Respondent’s reliance on Speiser v Randall (357 US 513) is misplaced. There, the issue was the allocation of the burden of proof and not the standard to be applied.
The immigration and right to counsel cases cited by respondent do not persuade the court that section 622 of the Family Court Act deprives respondent of due process of law.
In Woodby v Immigration Serv. (385 US 276), the Supreme Court recognized the drastic deprivations which might result from deportation of a resident alien, and yet refused to impose the "beyond a reasonable doubt” burden of proof in deportation hearings. In applying an intermediate standard of proof by "clear, unequivocal, and convincing evidence”[19] (p 286), the majority opinion of the court noted that Congress had not addressed itself to the required degree of proof. Here, the New York Legislature has spoken.[20]
*493 In Matter of Ella B. (30 NY2d 352), the Court of Appeals held that a parent has the constitutional right to assigned counsel in child neglect proceedings, reasoning that a parent’s interest in the custody of his child may not be curtailed without a meaningful opportunity to be heard. It does not follow that respondent, who has had a meaningful opportunity to be heard, is constitutionally entitled to proof free from reasonable doubt of the permanent neglect of her children.
Nor is there authority for applying the more rigorous standard in permanent neglect proceedings because the evidence adduced might tend to show that respondent committed a crime. (Kurz v Doerr, 180 NY 88.) This court finds no denial of respondent’s Fifth Amendment privilege against self incrimination in the testimony she chose to give on her own behalf. (Yee Hem v United States, 268 US 178; Matter of Fred S, 66 Misc 2d 683.) Moreover, no realistic possibility of criminal prosecution of respondent exists in this case.
"There is a strong presumption that a statute duly enacted by the Legislature is constitutional.” (People v Pagnotta, 25 NY2d 333, 337.) See, also, McKinney’s Cons Laws of NY, Book 1, Statutes, § 150, subd a, pp 312-313, setting forth the well-known principle of judicial restraint. This court declines to hold that section 622 of the Family Court Act is constitutionally infirm.
CONCLUSION
The court finds that the allegations required by section 614 (subd 1, pars [a], [b], [c], [d]) of the Family Court Act have been proved by a fair preponderance of the evidence. A dispositional hearing is to be scheduled. The possibility of continuing the relationship between the four children herein and their two siblings will be considered along with all other relevant issues.

. The unwed father of Hilda, Juana, Jose, Felix and Maria was found by the Family Court to have been guilty of neglect of all six children herein in 1971. He is named a respondent in these proceedings, but was not served with judicial process. The unwed father of Pedro is unknown. Since the adoption of the children alleged to be permanently neglected could proceed without the consent of either father, this court finds it unnecessary to reach the issue of jurisdiction to terminate their parental rights. Section 111 of the Domestic Relations Law provides that "consent shall not be required of a parent * * * who has been judicially deprived of * * * custody * * * on account of cruelty or neglect” and it omits unwed fathers from the category of persons whose consent to adoption is required. (See Matter of Malpica-Orsini, 36 NY2d 568; Doe v Department of Social Serv. of City of Poughkeepsie, 71 Misc 2d 666; Matter of Fernando F, 83 Misc 2d 421, all decided after Stanley v Illinois, 405 US 645.)

. (Family Ct Act, § 614, subd 1, pars [c], [d].) The allegations of the petition pursuant to section 614 (subd 1, pars [a], [b]) of the Family Court Act were undisputed.

. The court found, inter alia, that four of respondent’s six children had been hospitalized, that Felix and Jose had fallen from windows at different times while in the custody of the parents, that reports of child abuse had been filed and that the father had a criminal record and a history of drug addiction. It was alleged that Pedro had been beaten unconscious with an electric cord and that Maria, at nine months old, had been thrown from her carriage, sustaining head injuries.

. The issue of respondent’s financial ability to care for the children was not raised and it is assumed here, as in many permanent neglect cases, that a mother on public assistance does not lack financial ability under section 614 (subd 1, par [d]) of the Family Court Act.

. Respondent’s physical ability to care for the children during the years they have been in foster care was not denied at trial. (Family Ct Act, § 614, subd 1, par [d].)

. Pedro, who is now 13, lived for the first five years of his life with his grandfather in Puerto Rico.

. Rhode Island appears to be the only American jurisdiction, other than New York, which requires proof of agency efforts in proceedings to terminate parental rights. (See RI Gen Laws, § 15-7-7 [Supp 1974].)

. The court notes with disapproval the policy in many agencies of permitting visitation only at monthly intervals and in the sterile surroundings of the agency.

. Cf. Subdivision 6 of section 384 of the Social Services Law, discussed infra, n 11, where abandonment by a parent for six months permits termination of parental rights.

. Section 614 (subd 1, par [d]) of the Family Court Act is discussed infra.

. Subdivision 6 of section 384 of the Social Services Law provides a procedure, parallel to the Family Court Act, for the termination of parental rights when a child has been abandoned. Section 384 of the Social Services Law does not require a bifurcated hearing (fact-finding and disposition) and differs from article 6 of the Family Court Act in other significant ways — e.g., there is no requirement that the agency make diligent efforts to foster the parental relationship. And yet the courts have read the two statutes together, and have held that the protections afforded the parent by the Family Court Act must be accorded in a section 384 of the Social Services Law proceeding. (Matter of Anonymous [St. Christopher’s Home], 48 AD2d 696; Matter of Vanesa ”F”, 76 Misc 2d 617; Matter of Jennifer "S”, 69 Misc 2d 942; Matter of Jennifer "S”, 69 Misc 2d 951; Matter of Ellick, 69 Misc 2d 175; see, also, Matter of Steinberg v Steinberg, 18 NY2d 492.) By the same reasoning, article 6 of the Family Court Act must be read in light of the cases brought pursuant to subdivision 6 of section 384 of the Social Services Law which hold that the welfare of the child must govern the court when it makes a finding of whether facts exist to support termination. (Matter of Vanesa "F”, supra; Matter of Jennifer "S”, supra.) The bifurcated procedure of article 6 of the Family Court Act cannot be applied in a manner which would discriminate against children sought to be freed for adoption pursuant to the Family Court Act as opposed to those who are the subject of proceedings with the same purpose brought under the Social Services Law.

. (L 1973, ch 870, § 2.)

. (NY State Legis Annual, 1973, p 35.)

. Transcript of hearing, January 30, 1975, pp 6, 8, petitioner’s Exhibit 2 in evidence. The court’s record also shows that respondent, represented by an attorney, consented to extensions of foster care placement for the children on February 19, 1974.

. Section 622 of the Family Court Act states: " '[F]act finding hearing’ means in the case of a petition permanently to terminate custody a hearing to determine whether the allegations required * * * are supported by a fair preponderance of the evidence.”

. This question appears to have been considered and the statute upheld, without discussion, in Matter of Anthony L. "CC” (48 AD2d 415, 419). See, also, Matter of Fred S. (66 Misc 2d 683) and Matter of Peters (67 Misc 2d 775) upholding the preponderance standard in child protective proceedings under article 10 of the Family Court Act.

. (See, e.g., L 1971, ch 901, § 1 and L 1973, ch 870, § 1, amdg Family Ct Act, § 611; L 1973, ch 870, § 2, amdg Family Ct Act, § 614, subd 1, par [d]; L 1975, ch 701, § 1, amdg Family Ct Act, § 631; L 1975, ch 701, § 2, amdg Family Ct Act, § 614, subd 1, par [e]; L 1975, ch 704, § 1, amdg Social Services Law, § 384, subd 6; L 1975, ch 704, § 2, amdg Family Ct Act, § 611, L 1975, ch 704, § 3, amdg Domestic Relations Law, § 111; L 1975, ch 706, §§ 1-4, amdg Social Services Law, § 384, subd 7.)

. See, also, Governor’s Message, NY Legis Annual, 1959, p 415, approving chapters 448-450 of the Laws of 1959 from which article 6 of the Family Court Act is derived.

. Civil actions in which proof by "clear and convincing evidence” is required in New York are noted in Richardson, Evidence (10th ed, § 97) and include filiation proceedings, where the higher standard has been set by the courts (Matter of Dorn "HH” v Lawrence "II”, 31 NY2d 154; Commissioner of Welfare of City of N. Y. v Nestasi, 6 AD2d 680) in the absence of provision for degree of proof in article 5 of the Family Court Act.

. In a recent study of child neglect statutes in 54 American jurisdictions, as amended through August 31, 1974, 44 jurisdictions were found to have provisions for termination of parental rights. Five States require clear and convincing proof; in six States (including New York), the standard is a preponderance of the evidence. In no jurisdiction does the statute demand proof beyond a reasonable doubt. (Katz, Howe & McGrath, Child Neglect Laws in America, 9 Family LQ 1, 48.)