In the Matter of IKEM B., Alleged to be a Permanently Neglected Child. NEW YORK FOUNDLING HOSPITAL, Appellant; TRINA B., Also Known as IRIS S., Respondent.

First Department, April 8, 1980

#### APPEARANCES OF COUNSEL

*David H. Berman* of counsel *(Gerald E. Bodell,* attorney), for appellant.

*Julius Stern* for respondent.

#### OPINION OF THE COURT

FEIN, J. P.

This is an appeal from an order of the Family Court, New York County (EASTMAN, J.), dismissing a petition brought by New York Foundling Hospital seeking (1) termination of the

parental rights of respondent mother; (2) custody of the child Ikem B.; and (3) a declaration that the child was free for adoption, pursuant to section 384-b of the Social Services Law and article 6 of the Family Court Act.

The out-of-wedlock infant was born on March 25, 1974. The current whereabouts of the father are unknown and there is no evidence of any contact or support by him at any time. The infant came into the custody of the hospital on April 21, 1976 after he was found strapped in his stroller, alone and unattended, at about 4 A.M., near an abandoned building in Brooklyn. The mother was apprehended and arrested for burglary of the building. She subsequently pleaded guilty to criminal trespass. She claimed that on her way to the store with the child she was pursued and had to leave the infant unattended. In consequence of this incident, a finding of neglect was made against the mother by the Family Court, Kings County.

The child was placed with the Commissioner of Social Services on September 17, 1976 for an initial period of eight months. Thereafter placement was extended until March, 1979.

The mother, herself, had been placed in foster care at the age of three because her own mother was unable to care for her and her five brothers and sisters, four of whom were placed in foster care. Her schooling ended at the 10th grade at Julia Richman High School. She was transferred from one institution to another and from one foster family to another until the age of 18. The longest period with a foster parent was from 1972 to 1974. Although she knew her parents, she had no relationship with them. In a psychological evaluation in connection with the placement of Ikem B., on August 10, 1976, the mother was diagnosed as an inadequate personality with anxiety features needing psychiatric treatment and counseling. "Therapy should be directed in part to help her to accept responsibility for everything which may happen to her infant."

During 1976 the mother visited with her son Ikem on 12 or 13 separate occasions out of a possible 60 available dates, as noted in the agency records. On September 17, 1976, at the extension of placement hearing, she indicated upset at the decision. She believed her son should have been released to her. She was directed to avail herself of counseling which the agency was directed to provide. In December, 1976 she expressed upset that Ikem was in a foster home in The Bronx.

In view of the fact that she lived in Brooklyn and she was in an advanced state of pregnancy with a second child, it would be difficult for her to make the long trip to The Bronx and visit with Ikem. She could not visit him until after the baby was born. The second child, a son Cory, was born in January, 1977, the result of the mother's relationship with one Mr. Battles, her then current paramour.

During the entire year 1977, the mother visited Ikem only once, on March 1. In October, 1977 she advised the agency that she wanted Ikem returned but she was too busy with her second baby. During 1977 she had financial problems, moved from place to place and had fires in at least two of her places of residence. In 1978, prior to the filing of the petition, the mother visited Ikem twice, once on April 17 and the second time on June 8.

On June 8, 1978 she stated that she could not plan for Ikem, that she no longer lived with Mr. Battles and was now living with a man named Freddie Walker. She wished the agency to continue to care for Ikem and to help her with the many decisions she would have to make. Her new paramour (Walker) had three children in foster care in Brooklyn. She admitted she could not care for the three Walker children in addition to Cory and Ikem.

The record establishes that the mother consistently failed to keep appointments with the agency, failed to show up for visits with Ikem, failed to keep the agency informed of her changes of residence and offered no plan for the return of Ikem or for his care. The evidence is plain that for at least one year she had no contact with Ikem and neither had nor made any plans for his care.

The evidence is equally clear that the agency made only limited efforts to provide appropriate counseling or assistance in helping to work out a plan or program. The Family Court Judge improperly received in evidence testimony as to visits made with Ikem after the petition was filed (Family Ct Act, § 624; *Matter of Diana S.*, 68 AD2d 915).

The contact between the mother and the child and the agency in 1977-1978 may be summarized as follows:

1977

| | |
|---|---|
| 3/1 | Scheduled visit |
| 3/19 | Letter by agency in regard to a visit; mother never visited |
| 3/28 | Letter by agency, no response |
| 4/12 | Certified letter by agency, "unclaimed" |

| | |
|---|---|
| 4/28 | Mother called agency about a different problem, agency worker reminded her about Ikem, but mother failed to follow up |
| 5/10 | Letter by agency and appointment; mother never appeared |
| 6/1 | Letter by agency re: June 13 visit, later rescheduled to June 14 for mother's convenience |
| 6/14 | Mother failed to keep appointment and visit |
| 6/16 | Phone call by agency to set up a new appointment for 6/21, but she failed to meet that date, either |
| 6/22 | Letter by agency, once again to schedule a new appointment, this time for June 27; letter returned, mother's whereabouts unknown |
| 7/11 | Message left with agency re: new address but no phone number, indicating she will call again on July 19 |
| 7/19 | New "urgent" letter from agency after no word from mother |
| 9/10 | Scheduled visit, appointment not kept; unsuccessful attempt by caseworker to locate |
| 9/29 | Letter by agency, indicating plan to free Ikem for adoption due to mother's lack of involvement |
| 10/4 | Mother phoned agency, indicating desire to have Ikem |
| 10/21 | Mother missed scheduled visit |
| 10/25 and 26 | Mother phoned and came to agency, indicating desire to have Ikem at some unspecified future date, but offering no plan for care |
| 11/2 | Scheduled visit with Ikem not kept |
| 11/9 | Rescheduled visit with Ikem not kept; reminder letter on 11/4 returned, "moved, no forwarding address" |
| 1978 | |
| 3/1 | Agency sent letter to new address, located after investigation |
| 3/9 | Mother contacted agency |
| 4/17 | Mother visited Ikem for the first time since 3/1/77 |
| 6/8 | Mother called agency |
| 6/29 | Petition filed; several visits ensued |

The issue is whether the parental rights of the mother must be terminated because of her total failure for over a year to maintain contact with Ikem and to plan for his future. Even if such a failure be found, what effect is to be given to the fact that the agency made only minimal efforts to discharge its statutory duty to encourge and strengthen the parental relationship?

Part 1 of article 6 of the Family Court Act authorizes termination of the parental rights of parents of a "permanently neglected child". Section 611 of the Family Court Act incorporates by reference the definition of a permanently neglected child as set forth in subdivision 7 of section 384-b of the Social Services Law as follows: "(a) For the purposes of this section, 'permanently neglected child' shall mean a child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year

following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child. In the event that the parent defaults after due notice of a proceeding to determine such neglect, such physical and financial ability of such parent may be presumed by the court."

Permanent neglect is to be found if parental failure "to maintain contact with or plan for the future of the child" has occurred "substantially and continuously or repeatedly" for "more than one year" after the "child came into the care of an authorized agency". It is clear here that there was a complete failure to maintain contact or to plan for more than one year. The Family Court Judge so found. The statute requires a showing that the parent who allegedly failed to maintain contact with or plan for the future of the child was "physically and financially able to do so". The meaning of this phrase has been the subject of varied holdings (*Matter of Stephen B.,* 60 Misc 2d 662, 666, affd *sub nom. Matter of Behrman,* 34 AD2d 527). The Family Court Judge concluded that because of the mother's unfortunate history and her circumstances during the year prior to the application, the birth of another child, the distance between herself and the foster parent, the occurrence of the two fires which caused her to move frequently, and other circumstances, she "acted within her physical and financial ability. Clearly she has never rejected this child and has maintained contact with him whenever possible." We disagree. The record is plain that for over one year there was almost no effort to maintain contact with the child and no effort whatsoever to plan for the future of the child. Both are required (*Matter of Orlando F.,* 40 NY2d 103).

The Family Court Judge went on to find that the agency failed to make diligent efforts to encourage and strengthen the parental relationship, as required by the statute. The obligation of the agency is to offer rehabilitative services and other supportive assistance to aid a parent in making such plans. The record is clear that the agency made only a few meagre efforts to make counseling services available. The communications arbitrarily fixed dates for visits. There was only a

limited follow-up when there was no response. There was only a sparse showing that the requisite counseling or other rehabilitative services were offered and rejected. Broken conference appointments should not be relied on by such an agency to avoid the requisite effort to assist a mother with a plan and a program for the return and upbringing of her child.

However the inadequacy of the agency's efforts to render such assistance is not determinative. It is undisputed that for over one year this mother had almost no contact with her child, made no real effort to keep in contact with him, and had no plans for his future. She was not in a position to take the child at the time of the hearing, and had no plan or program to care for or bring him up in the near future. On this basis we are constrained to hold that parental rights must be terminated.

It has been sufficiently demonstrated that respondent failed to maintain any contact with her son Ikem. But even if there be excuses for such neglect, as suggested by the Family Court Judge, it is beyond dispute that there was a total failure to plan. As held in *Matter of Orlando F.* (40 NY2d 103, 110, *supra)* it is now clear that "a finding of a failure to plan, in and of itself, suffices to support a determination of permanent neglect". In this respect the facts here are strikingly similar to those in *Orlando F.,* described by the court as follows (pp 110-111): "To be sure, the mother has evinced a 'burning desire' to regain custody of the child, but it is undisputed that in the three years preceding this litigation she failed to take the affirmative steps necessary to insure that Orlando would be the rightful beneficiary of an adequate home life if returned to her. Missed appointments, promises to secure her own apartment—which never reached fruition, living with various persons and an inability to be placed in a job as a result of nonattendance at the rehabilitation center compels this conclusion."

We are not unmindful of the caveat in *Orlando* that the planning requirement should not become simply a device to permit termination by evaluating the adequacy of the parents' plans against standards which are unrealistically high. But here there is simply no plan, nor even the suggestion of a plan. The combination of the failure to maintain contact and the neglect to plan requires a finding of permanent neglect and a termination of parental rights unless the inadequate efforts of the agency properly to provide counseling advice and

assistance requires a different result. We are cognizant of the rule that a fact-finding hearing such as this, unlike a dispositional hearing, is not to proceed upon a "best interest of the child analysis" *(Matter of Female W.,* 47 NY2d 861; *Matter of Sanjivini K.,* 47 NY2d 374). As stated in *Sanjivini K.* (p 382): "In any event a court may not terminate all parental rights by offering a child for adoption when there has been no parental consent, abandonment, neglect or proven unfitness, even though some might find adoption to be in the child's best interests *(Matter of Corey L v Martin L,* 45 NY2d 383)."

Here we have permanent neglect, failure to maintain contact and failure to plan. However unfortunate the mother's background, it provides no basis for avoiding the obligation to the child imposed by the statute.

The deficiencies in the agency's performance of its obligation do not justify the mother's failure to maintain contact or to plan, or preclude a finding of neglect under the circumstances of this case. The requirement to plan is a requirement of the parents. "This requirement presupposes, at a minimum, that the parents take steps to correct the conditions that led to the removal of the child from their home * * *. Yet, the planning requirement also obligates the parents to project a future course of action * * *. For this reason, the adequacy of the parents' plan must not be evaluated with reference to unrealistically high standards * * *. It is also the reason that the Legislature wisely imposed an obligation on the part of the agency to strengthen the relationship between parent and child." *(Matter of Leon RR,* 48 NY2d 117, 125.)

Unlike *Leon R. R.,* this is not a case in which the agency "actually hindered respondents' efforts to maintain contact with [the child] and plan for his future * * * [or] actively sought to plant the seeds from which a finding of permanent neglect might grow." (48 NY2d, at p 126.) Nor is it a case like *Sanjivini K (supra)* in which the mother's efforts to plan and maintain contact were blocked by the agency's repeated efforts to prove the mother guilty of statutory abandonment, permanent neglect or to show her to be unfit. (Cf. *Matter of Donna G.,* 70 AD2d 188, where the agency's lack of "diligent efforts" was excused only because such efforts might be "detrimental to the best interests of the child"; Social Services Law, § 384-b, subd 7, par [a].)

Here we have a mother who failed to maintain contact or to plan or to take advantage of or utilize the agency's limited

efforts to foster the parent-child relationship. There was nothing by way of plan offered by the mother to evaluate. The agency social worker testified that in March of 1978, in a discussion about visitation, the worker "asked her why she had not been visiting Ikem and she said that she didn't see any point in visiting as long as she wasn't prepared to take him back and at that point she admitted that she wasn't prepared for Ikem's return."

The burden of proof has been met to establish a failure to maintain contact and a failure to plan. Under such circumstances the deficiency of the agency, although it is not to be condoned, does not preclude the finding of neglect which this record requires (see *Matter of Female W.,* 47 NY2d 861, *supra; Matter of Donna G,* 70 AD2d 188, *supra).*

"Where the social problems and history of the mother's past neglect indicate a bleak future for the children 'we must not get lost in an analysis of the niceties of the precise degree of required diligence of effort' *(Matter of Ray A. M. [Sugarman],* 48 AD2d 161, 164, affd 37 NY2d 619)." *(Matter of Karas,* 59 AD2d 1022, 1023.)

Accordingly the order of the Family Court, New York County (EASTMAN, J.), entered January 11, 1979, which dismissed the petition brought by the New York Foundling Hospital seeking (1) permanent termination of all parental rights of the respondent mother, (2) custody of the child, and (3) a declaration that the child was free for adoption pursuant to section 384-b of the Social Services Law and article 6 of the Family Court Act should be reversed on the law and the facts, without costs, and the petition reinstated and the proceeding remanded to the Family Court for further proceedings, premised upon a finding of permanent neglect.

SULLIVAN, J. (concurring). We agree that the petition should be reinstated and the matter remanded for a dispositional hearing. As Justice FEIN's opinion persuasively demonstrates, the agency has clearly established that for a period of more than one year the mother failed to maintain contact or to plan for the return of her child or for his care. The child is now almost six years old, and since he came into the custody of the agency at the age of two, his mother's contact with him has been, at best, minimal.

We disagree, however, in two respects with the finding that the agency made insufficient effort to develop a mother-child

relationship. Initially, it is not at all clear to us that a finding of permanent neglect may be reached if the agency failed to undertake "diligent efforts to encourage and strengthen the parental relationship." (See Social Services Law, § 384-b, subd 7, par [a].) *Matter of Female W.* (47 NY2d 861) does not support the proposition that an agency's failure to attempt to establish a relationship does not preclude a finding of permanent neglect. That case dealt with the issue of abandonment. In such an instance the agency is charged with the negative duty not to interfere with a parent's efforts to make contact with the child. (Social Services Law, § 384-b, subd 5, par [a].) On the other hand, the statute essentially defines a "permanently neglected child" as one whose parent or custodian has failed for more than one year to maintain contact with the child "notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship", thus indicating an affirmative duty on the agency to make such efforts. But under our view of the case this is an issue we need not reach since we find that the agency was not derelict insofar as its mandate under the statute is concerned.

A family worker was assigned to work with the mother in the community, along with a regular foster care worker. The family worker was to encourage the mother to undergo therapy. From mid-March, 1977 until the petition was filed in late June of 1978, 11 letters were sent to the mother to set up appointments, most of which were utterly ignored. The agency agreed to semimonthly visitations, but, except for one visit on March 1, the mother failed to exercise that privilege for the entire year of 1977. On March 19, 1977 the agency sent a letter arranging for visitation, but the mother failed to visit and did not call to cancel. A letter sent on March 28 received no response, and one sent April 12 was returned "unclaimed." In a telephone conversation on April 28 the agency urged the mother to come in for an appointment. She did not show up for a May 10 appointment, begged out of a June 13 home visit because of a fire at her place of residence, and again failed to show up for agency scheduled appointments on June 14 and June 21. A June 22 letter was returned with the stamp "moved". The mother did not inform the agency of her move until July 11. A July 19 letter was ignored and a September 10 home visit was not kept. The mother did telephone the agency after receiving a September 29 letter. She expressed a desire to have the child home with her, but subsequently

missed an October 21 visit. She arrived at the agency at 3:00 P.M. for a 9:00 A.M. October 26 appointment, but indicated no plans for the child. A visit with the child was scheduled for November 2 but the mother telephoned that day to break the appointment. She failed to appear for a November 9 visit, which the agency had scheduled, and then sought to confirm by a letter which was returned, stamped "moved and left no forwarding address." For the next several months there was no contact. Having moved again the mother failed to communicate with the agency or to furnish a new address. Finally, on March 9, 1978, she contacted the agency after it had written to her at an address which it had ascertained through investigation, and a visit with the child took place on April 17, 1978, the first in over a year.

Under these circumstances no reason exists to fault the agency. It had to contend with a mother who steadfastly resisted its efforts to foster a relationship. She repeatedly ignored the letters and telephone calls, failed to show up for scheduled appointments without excuse or notification, moved without informing the agency of her new address and, in the one appointment with the agency which she kept in the year in question, showed up six hours late. The agency undertook demonstrable affirmative steps to maintain contact with the mother and to initiate a relationship between her and the child. Whether more action could have been taken is a question that we need not consider, as long as sufficient attempts were made by the agency to meet its obligation: "It may be that the adoption agency could have tried harder to encourage the natural mother-child relationship in order to satisfy the most searching mind that no more could reasonably be done. However, we must not get lost in an analysis of the niceties of the precise degree of required diligence of effort where the life-style and apparent sociopathology of the mother (joined with her undoubted past neglect) indicate a bleak future indeed for the child." (Matter of Ray A. M., 48 AD2d 161, 164, affd 37 NY2d 619.) Thus, the agency is entitled to prevail because, despite its diligent efforts to encourage and strengthen the parental relationship, the mother permanently neglected the child.

BLOOM, J., concurs with FEIN, J. P.; SANDLER and SULLIVAN, JJ., concur in an opinion by SULLIVAN, J.

Order, Family Court, New York County, entered on January

11, 1979, reversed, on the law and the facts, without costs and without disbursements, the petition reinstated and the proceeding remanded to the Family Court for further proceedings premised upon a finding of permanent neglect.