*169 OPINION OF THE COURT
Mortimer Getzels, J.
In this proceeding for commitment of the guardianship and custody of a child, the petitioning agency, McMahon Services for Children, seeks to terminate the parental rights of the mother on the grounds of abandonment and permanent neglect and of the putative father on the grounds of abandonment.
The child Charlene D. was born in Queens, New York, to a 15- or 16-year-old Charity D.,* who was illegally present in this country, and residing with a paternal aunt and a cousin. All that can be uncovered about the putative father is that his first name is Paul, that he is black and that he was about 18 years of age at the time the child was conceived. Under pressure from the relatives with whom she was living, Charity voluntarily placed Charlene with the Commissioner of Social Services on December 14,1977 and returned to Haiti in the middle of January, 1978.
The putative father, served by publication, is in default. After inquest, the court finds by clear and convincing evidence that Paul “Doe” has abandoned Charlene D., within the meaning of subdivision 5 of section 384-b of the Social Services Law.
With respect to the mother, however, the unusual facts underlying the allegations of abandonment and permanent neglect pose the following issue of first impression to this court: in what circumstances may a nonresident alien parent of a child born in this country, who places the child with the Commissioner of Social Services and returns to her native land, be found to have abandoned and/or permanently neglected that child if she is not permitted to reenter the United States?
In June, 1978, responding to letters from the agency, Charity wrote that she wanted to care for the child herself. She thereafter telephoned from Haiti that she was planning to return to New York to live with her aunt and cousin. The agency got in touch with the aunt who stated that she would not allow Charity to return to her home.
*170 In the light of the mother’s determination to re-enter the United States, the agency undertook to help her by enlisting the aid of the American Civil Liberties Union, a number of Catholic organizations, a Congressman and both United States Senators from New York. It was ascertained that there was no possibility of Charity being admitted to the United States, at least until her child became 21 (at which time Charity might obtain a “non-quota” immigration status), unless the paternal aunt consented to sponsor the immigrant visa petition of Charity’s father. With the assistance of the Columbia Law School Immigration Clinic, the appropriate application was filed in January, 1981. In June the United States Consulate in Haiti informed the agency that the father had been deemed ineligible for a visa because his sponsor was a welfare recipient and he was not considered employable in the United States.
In September, 1978 the agency had requested International Social Services to conduct a home study of Charity’s residence in Haiti. According to the report completed in August, 1979 her family was destitute. In December, 1981 the agency received an updated report from International Social Services which indicated that Charity’s living conditions “in every aspect are absolutely inacceptable [sic] as regards to the possibility of receiving Charlene and being able to provide all her needs sufficiently and satisfactorily.”
At a foster care review proceeding in January, 1982, the court directed the agency to initiate the instant proceeding to free Charlene for adoption. After action was instituted in February, 1982, the agency received a telephone call from Charity in which she repeated her opposition to adoption and her intention of returning to New York. Charity also wrote to the agency twice, refusing to consent to Charlene’s adoption and asking that the child be given to her aunt. On the basis of her oral and written responses to service, Charity D. was deemed to have appeared and was assigned counsel.
Charity D. voluntarily placed Charlene with the Commissioner of Social Services. In the ensuing month that she remained in New York and in the more than four years *171 between the time she returned to Haiti and the date this petition was filed, she neither visited nor communicated with Charlene. She did not write to Charlene, did not send gifts or cards and did not telephone the child although able to do so and not prevented or discouraged from doing so. Nor did she, in the face of her inability to visit Charlene herself, encourage or request her aunt or cousin to visit with Charlene. The one visit by relatives with Charlene was initiated by the agency.
She has never supported Charlene since her placement and her contacts with the agency have been sporadic and have occurred only in response to communications from the agency. Furthermore, she made no contact with the agency for more than two years immediately preceding the filing of this petition.
The uncontroverted evidence in the case record indicates that Charity was not deported, but returned to Haiti because of family pressure. Thus her continuing inability to visit Charlene was self-imposed by her decision to leave New York. Although very young herself at the time she returned to Haiti, she was capable of choosing to remain in New York and accept care for herself and Charlene or to take Charlene with her to Haiti.
Accordingly, this court finds by clear and convincing evidence that Charlene has been abandoned by her mother within the meaning of subdivision 5 of section 384-b of the Social Services Law, notwithstanding Charity’s refusal to surrender the child for adoption and her sporadic contacts with the agency. (See, e.g., Matter of Corey L. v Martin L., 45 NY2d 383; Matter of Vanesa “F”, 76 Misc 2d 617.)
The court further finds that Charity failed to plan for the future of Charlene within the meaning of subdivision 7 of section 384-b of the Social Services Law. She neither formulated nor acted to accomplish a realistic plan to provide Charlene with a stable home. (See, e.g., Social Services Law, § 384-b, subd 7, par [c]; Matter of Orlando F., 40 NY2d 103, 110; Matter of Stephen B., 60 Misc 2d 662, affd sub nom. Matter of Behrman, 34 AD2d 527.) In the face of the legal obstacles to her return to New York, she never offered an alternative plan for Charlene’s future. Despite her insistence on regaining custody of Charlene, in the four *172 years since Charity left the United States, she took no affirmative steps to provide Charlene with an adequate home life in Haiti. (See Matter of Leon RR, 48 NY2d 117.) Instead she blindly and futilely pursued re-entry to the United States and a return to residing with her aunt as her sole means of providing for Charlene’s future care.
Furthermore, the court finds that Charity had the physical and financial ability to plan for Charlene’s future. Powerless to return to this country, she nevertheless was able to formulate alternative plans for Charlene. Her lack of a visa would not have prevented her from seeking help from her relatives in this country to care for her child, or from taking steps to improve her living conditions in Haiti. Moreover, for more than two years immediately preceding the date the proceeding herein was commenced, she made no attempts to work with the agency to plan for Charlene although her later contact with the agency indicated no physical or financial inability to contact the agency during that period.
The petitioner went beyond the statutory requirement of “diligent efforts” which are defined as “reasonable attempts by. an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child” (Social Services Law, § 384-b, subd 7, par [f ]). The agency kept the mother and her relatives in New York informed of Charlene’s health and development, obtained appointment of the American Civil Liberties Union as special guardian in the foster care review proceeding, and actively aided the mother in her attempts to obtain a visa. These efforts continued to be made despite the mother’s failure to contact the agency for over two years prior to the filing of this petition.
Accordingly, the court finds by clear and convincing evidence that Charlene has been permanently neglected by her mother by reason of her failure to formulate or act on a realistic and feasible plan for Charlene’s future within the meaning of subdivision 7 of section 384-b of the Social Services Law, despite her ability to do so and notwithstanding the agency’s diligent efforts to encourage and strengthen the parent-child relationship.
*173 It is the conclusion of this court that a nonresident alien who gives birth to a child in this country, places the child with the Commissioner of Social Services, and returns to her native land, may be found to have abandoned that child even if she is subsequently legally barred from reentering the United States.
A parent who voluntarily leaves this country should be presumed to have done so with the knowledge that he or she may be unable to return, thus constituting an intent to forego his or her parental obligations, whereas no such presumption should attach to a parent who is deported. Accordingly, a finding of abandonment on the grounds of the parent’s failure to visit the child can be made against a parent who voluntarily left this country in light of the fact that his or her physical inability to visit the child was knowingly self-imposed.
Conversely, a deported parent should not be held to have abandoned a child for failure to visit the child since the inability to visit is beyond his or her control. However, whether a parent voluntarily departs this country or is deported, a finding of abandonment based on the parent’s failure to contact the child or agency for the statutorily requisite period can and should be made.
The court further concludes that a nonresident alien parent placing a child with the Commissioner of Social Services and leaving this country may be found to have permanently neglected that child either for failure to substantially and continuously or repeatedly to maintain contact with the child or for failure to plan for the child’s future.
The physical and financial ability of a parent to contact or plan for their child may be presumed by the court if a parent is properly served and defaults. (Social Services Law, § 384-b, subd 7, par [a].) That presumption should be no less applicable to parents who voluntarily leave this country and those who are deported inasmuch as the inability to return to this country does not render the parents incapable of communicating with the child or the agency or of formulating and acting on a plan for the child’s future.

 Owing to the unavailability of reliable records from Haiti, Charity’s age is uncertain. On Charlene’s birth certificate, Charity’s age is noted as 16. The agency case records indicate she was 15 at the time of Charlene’s birth.