*600 OPINION OF THE COURT
Minna R Buck, J.
By petition filed August 22, 1985, petitioner seeks to terminate the rights of the above-named natural parents of the child Starr L. B., date of birth March 2, 1982. The stated grounds are that each of the parents failed to visit or contact said child or the Onondaga County Department of Social Services (DSS), in whose care the child had been placed, for a period of six months immediately prior to the initiation of the proceeding, and that respondent mother failed for more than one year after the child was placed in DSS’ care to maintain contact with or plan for the child’s care, although able to do so, and despite petitioner’s diligent efforts to encourage and strengthen the parental relationship. The foster parents, in whose care the child had been placed by DSS for more than 18 months, appeared in person and by their attorney, and said attorney was present and permitted to participate in the hearing held on November 27, 1985 (Social Services Law § 384-b [3] [b]; § 392 [4] [c]). Respondent mother was not present during the hearing, although she had appeared personally and been given notice of the hearing date and of the name and telephone number of her assigned attorney; said attorney was present during the hearing. Respondent father was present throughout with his attorney, as was the Law Guardian for the child.
 For the reasons set forth below, the court finds, on the record as a whole, clear and convincing evidence that each of the respondents has abandoned the child, as that term is defined in Social Services Law § 384-b (5). The child came into the care of DSS at birth, upon her release from the hospital, pursuant to orders of this court under docket N-59-82 and has been continuously in their care ever since. She was placed in the home of the present foster parents in the spring of 1983 and has resided with them continuously since that time.
With respect to respondent mother, the caseworker testified that for a year or more prior to September 1984, Mrs. B. was exercising supervised visits with the child every other week, as part of a service plan instituted pursuant to the earlier court order. After one such visit in September 1984 these visits were suspended by DSS because Mrs. B. is alleged to have bitten the child; Mrs. B. was advised, in person, that visits might be resumed, contingent upon her submitting to a psychiatric evaluation and following the recommendations thereof. Mrs. B. failed to appear for such evaluation and since September 1984 has never requested a resumption of visita *601 tion. Nor did she contact the agency for any other purpose except to leave a message in the DSS office on one occasion in April 1985 as to a change in her residence.
Mrs. O., the foster mother, has lived at her present residence for the past seven years. She testified that she had never met either respondent and that since September 1984 she had never been contacted by Mrs. B., either directly or indirectly, and had never received any letters, calls or gifts addressed to the child from Mrs. B.
With respect to respondent father, the record shows that Mr. B. has been continuously incarcerated since before the birth of the child. Mrs. O. testified that she had never met Mr. B. or been contacted by him, or received any calls, letters or gifts for the child from him, although she acknowledged that the child from time to time has received gifts from the paternal grandparents. The caseworker’s testimony was that she had been assigned to the case since February 15, 1985 and had reviewed all the case records pertaining to this child; that she had never met or spoken to Mr. B., had never received any messages from him and had never received any request from him or from his parents to set up visitation for him with the child; and that there was nothing in the case record (where such contacts are routinely noted, if and when they occur) to indicate that Mr. B. had made any such contacts with her predecessor. In describing her duties and departmental procedures in this and other cases of children in foster care, the caseworker noted that she would have made arrangements for regular contacts with Mr. B. and at least explored any request for visitation with the child, had she been requested to do so by Mr. B.
The testimony of the paternal grandparents was that at the time of the child’s birth and while she was still in the hospital, Mr. B., who was then detained in the local penitentiary, asked them to assume custody of the child, since the mother was then also incarcerated. However, a Family Court order placing the child in the DSS custody was already in effect and the child was not released to them. Although they told the assigned caseworker on several occasions since then that their son wished them to have custody of the child, no such petition was filed until September 17, 1985, after the present proceeding was commenced. Grandparents have nevertheless taken advantage of supervised visitation with the child on a regular basis. During 1983 and 1984 this visitation was approximately every other week; it has recently been sched *602 uled less frequently, apparently as a result of a decision by DSS. The visits have on several occasions been joined in by other members of Mr. B.’s family, including several nieces and nephews, and on occasion grandparents gave the child gifts during such visits.
Mr. B.’s parents have also visited him regularly throughout his incarceration, up to the present time, at least once each month and sometimes more frequently. Although Mr. B. has never been granted a "furlough” for home visits during this period, he does maintain frequent telephone contact with his parents; these calls occur sometimes as often as five to six times per week and last 20 to 40 minutes.
Each of the grandparents confirmed that Mr. B. asked them to see about arranging a visit by the child and that on at least two occasions, the last one about six or seven months prior to the hearing, they relayed to him the information they had obtained from a DSS staff member (i.e., that Mr. B. would have to contact DSS directly and make arrangements through them and Mr. B. said he would do this). Mrs. B., Sr., acknowledged that she did not communicate Mr. B.’s request to the assigned caseworker. Neither of them remembered Mr. B. ever mentioning to them any letter received by him from the present caseworker.
The essence of Mr. B.’s testimony on his own behalf was that he could not communicate with the child or agency because he is functionally illiterate and therefore could not write; that he is without means to purchase or send gifts; that he was unable to contact the child by telephone because both he and his parents are unaware of the foster parents’ address or telephone number; and that the paternal grandparents were acting as his agent in giving gifts to the child. Moreover, he argues that his repeated and consistent requests to his parents that they take steps to gain custody of the child constitutes an indirect contact by him and refutes the presumption that he evinced "an intent to forego his * * * parental rights” (Social Services Law § 384-b [5] [a]).
In order to sustain its heavy burden of proof (Social Services Law § 384-b [3] [g]; Santosky v Kramer, 455 US 745), the petitioner seeking to terminate parental rights is required to show that the parent(s) failed to visit the child and to communicate with the child or agency, although "able to do so and not prevented or discouraged from doing so by the agency.” (Social Services Law § 384-b [5] [a].) In the absence of evidence *603 to the contrary, such ability to visit and communicate shall be presumed. (Social Services Law § 384-b [5] [a]; Matter of Julius R, 63 NY2d 477; Matter of Vunk, 127 Misc 2d 828.) A parent’s intent is to be inferred from his or her conduct (Social Services Law § 384-b [5] [b]) and upon a showing of lack of contact for the requisite period, the burden is properly placed on the parent to come forward and explain the reasons for such failure (Matter of Ulysses T,, 87 AD2d 998 [4th Dept 1982]).
In the case of Mrs. B., the record is clear that she had no contact with either the child or the agency for a period of six months prior to the filing of the petition, except for one occasion when she “stopped by” the DSS office and left word of her new address. She did not inquire about her child or attempt to communicate directly with the caseworker and, for all we know, her visit to the DSS office may have been for totally unrelated purposes. The DSS suspension of visitation was a reasonable move to protect the interests of the child. Prior to that suspension, DSS had facilitated contacts by transporting the child every two weeks to visit with mother. Mrs. B. never obtained the psychiatric evaluation which she was told was a condition precedent for the resumption of visitation and has never offered an explanation for her failure to do so. There is no evidence that Mrs. B. was otherwise prevented or discouraged by the agency from making appropriate contacts. There is no evidence that she was physically incapacitated or mentally incompetent. She did not even attend the hearing, or contact her attorney to explain her absence. Under the circumstances, the brief contact in April 1985 is insufficient to overcome the inference warranted by her actions, or inaction, during the six months prior to the filing of the petition (Matter of Julius P., supra; Matter of Ulysses T., supra, at p 999; Matter of Charlene D., 121 Misc 2d 168).
This court also respectfully declines to follow the analysis set forth in Matter of Madeline R. (117 Misc 2d 14, 17-18) to the effect that the omission in section 384-b (5) of the phrase "insubstantial or infrequent contact visits or communication * * * shall not, of itself, be sufficient” to preclude a finding of abandonment, which appears in Domestic Relations Law § 111 (6) (b), suggests that a single communication with the agency during the relevant six-month period might in itself be sufficient to rebut petitioner’s proof of abandonment. Social Services Law § 384-b (4) (b) (as added by L 1976, ch 666, § 3) *604 specifically incorporates the definition of abandonment contained in Domestic Relations Law § 111.
In the case of Mr. B., his own testimony and that of his parents made it clear that he had the ability to make telephone contact with the agency. He is permitted one telephone call daily, of at least 20 minutes’ duration, and exercises the privilege regularly to talk to his parents at least three times each week; he had the agency’s telephone number and knew the name of the previous caseworker who, following regular DSS procedures, would have referred him to the proper person or had that person contact him. He had the opportunity to communicate directly with the caseworker assigned to his child’s case when he appeared with counsel in this court on September 25, 1984, but there is no evidence that he requested any such communication, either for purposes of arranging visitation or even to inquire about his child. He never followed through with submitting a request to DSS to arrange visitation even though his parents told him, more than once, what the procedure was. Mr. B.’s stated inability to read or write would obviously preclude his writing himself, either to the child or to the agency, but it strains credulity to accept that Mr. B. was unable to obtain assistance in this connection from his parents, or from a chaplain or counselor within the facility, had he requested it. He could have had packages mailed from the facility; while the court recognizes that his financial resources are meager, it is hard to believe he has been unable ever since his incarceration to accumulate the price of a trinket or a birthday card to send his child. On this record, the court finds that respondent father did not carry out the obligations owed even by an incarcerated parent (see, McKinney’s Cons Laws of NY, Book 52A, 1986 Pocket Part, Social Services Law § 384-b, Legislative Findings and Declaration for 1983 Amendment, p 13).
The court accepts Mr. B.’s representations that he has, consistently since the birth of the child, expressed his wish that his parents seek and obtain custody of the child, but in and of itself that does not rebut the inference to be drawn from his conduct (Matter of Ulysses T., supra). Indeed, it might be construed as an intent on his part to "forego his * * * parental rights and obligations” (Social Services Law § 384-b [5] [a]) in favor of having his parents assume them. Even construing these requests in the light most favorable to Mr. B. *605 —Le., that he wanted to continue and safeguard his parental rights and obligations by using his own parents as surrogate parents to the child — does not alter the fact that he did not himself have even the minimal contacts required to rebut the allegation of abandonment; his subjective intent, "unsupported by * * * acts manifesting such intent” is not sufficient (Social Services Law § 384-b [5] [b]).
The reliance by respondents’ counsel on Matter of Madeline R. (117 Misc 2d 14, supra) is inapposite. In that case, indirect communication with the children by respondent mother and a letter to the agency during the relevant six-month period were considered sufficient to rebut the inference of abandonment. It is clear that the court’s refusal to find abandonment in Madeline R. was heavily influenced by its findings that the agency had failed to respond to two letters by respondent mother, who asked for information about the children (whom she had placed voluntarily with the agency before she left the country), expressed her intention not to abandon them and requested that they be placed in the care of the maternal grandmother, who had repeatedly sought custody. Moreover, mother had sent money, gifts, messages and a photograph of herself and a birthday card for one of the children, through the maternal grandmother, in the six months prior to the filing of the petition. There is no showing in the instant case that respondent father ever took advantage of his frequent contacts with the paternal grandparents to communicate even indirectly with his child. Here, both grandparents testified that they bought the child gifts "because she’s our grandchild,” not because respondent father asked them to; grandmother stated their motivation in seeking custody was not to act as the father’s agent, but because they felt it important for the child to know the other members of her father’s family. Nor does the fact that grandmother showed the child a picture respondent father had given her of himself and told her that "daddy loves you” qualify as a communication from father absent testimony, missing here, that this was done at father’s direction.
Accordingly, petitioner’s attorney shall submit an order declaring the child to have been abandoned by each of the respondents and committing the child to the guardianship and custody of the Commissioner of Social Services.